# IN THE SUPREME COURT OF IOWA

No. 13–0146

Filed May 23, 2014

**HAWKEYE LAND COMPANY,**

Appellant,

vs.

**IOWA UTILITIES BOARD,**

Appellee.

---

Appeal from the Iowa District Court for Linn County, Nancy A. Baumgartner, Judge.

Property owner appeals district court judgment affirming decision of Iowa Utilities Board allowing independent transmission company to use pay-and-go procedure of Iowa Code section 476.27, the railroad-crossing statute. **REVERSED.**

Jon M. McCright of Lynch Dallas, P.C., Cedar Rapids, and Andrew C. Potter, Cedar Rapids, for appellant.

David J. Lynch, General Counsel, and Cecil I. Wright II, Assistant General Counsel, Des Moines, for appellee Iowa Utilities Board.

Mark R. Schuling, John S. Long, and Ronald C. Polle, Des Moines, for appellee Office of Consumer Advocate.

Theresa C. Davis and Nancy J. Penner of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for appellee ITC Midwest LLC.

Dennis L. Puckett and Benjamin M. Clark of Sullivan & Ward, P.C., West Des Moines; Robert P. Jared, Davenport; Julie A. Smith, Johnston; and Danielle K. Dixon Smid, Des Moines, for appellees Iowa Association of Electric Cooperatives, MidAmerican Energy Company, Interstate Power and Light Company, and Iowa Association of Municipal Utilities & Iowa Rural Water Association.

Mark Godwin, Des Moines, for appellee City of Des Moines and Des Moines Metropolitan Wastewater Reclamation.

**WATERMAN, Justice.**

This appeal presents questions of first impression on the interpretation and constitutionality of the railroad-crossing statute, Iowa Code section 476.27 (2009). This statute was enacted to facilitate public utility crossings over railroad tracks. It authorizes a "pay-and-go" procedure with a legislatively predetermined $750 standard crossing fee the utility pays to the owner of the railroad right-of-way. The Iowa Utilities Board (IUB) allowed an independent transmission company, ITC Midwest, to use this statute to run electrical power lines across a railroad at three locations—over the objection of the owner of the railroad-crossing easement. That owner, Hawkeye Land Company, does not own or operate a railroad, but owns the right to sell easements across active railroad tracks. An administrative law judge (ALJ) upheld the use of the pay-and-go procedure and denied compensation beyond the $750 per crossing. IUB, asserting interpretive authority over section 476.27, reached the same conclusions in its final decision, and the district court affirmed on judicial review. We retained Hawkeye Land's appeal.

Hawkeye Land contends the crossing statute does not apply to it or to ITC Midwest, because it is not a "railroad" and ITC Midwest is not a "public utility" within the meaning of the statute. Hawkeye Land alternatively argues $750 is not just compensation for crossing its easement, and the pay-and-go procedure is unconstitutional under the takings clause of article I, section 18 of the Iowa Constitution. Hawkeye Land claims its similar easement sales show just compensation for each crossing is $30,000, and it also seeks to recover attorney fees, costs, and expenses denied by IUB.

For the reasons explained below, we determine that IUB lacks interpretive authority over the terms of the crossing statute. We hold section 476.27 applies to Hawkeye Land but that ITC Midwest, as an independent transmission company, is not a public utility allowed to use the pay-and-go procedure. We therefore reverse the judgment of the district court and decision of IUB. Because we resolve the appeal on the statutory ground, we do not reach the constitutional issue or remaining claims.

## I. Background Facts and Proceedings.

**A. The History and Purpose of the Crossing Statute.** We begin with a review of the events that led to the passage of Iowa Code section 476.27, to provide context for the issues we decide today. In 2000, the Iowa Senate issued a concurrent resolution "relating to a study of the issues involving railroad rights-of-way crossings by utilities." S. Con. Res. 119, 78th G.A. (Iowa 2000). Senate Concurrent Resolution 119 proposed that representatives from Iowa utilities—including electricity, natural gas, telephone service, rural water service—meet with railroad representatives to consider legislative solutions that might "resolve legal and practical problems and differences of opinion" between the parties. *Id.* IUB was to facilitate the meetings. *Id.*

The problems referred to in the resolution related to the requirements utilities had to fulfill in order to secure a railroad crossing and the fees railroads charged utilities for crossings. The utilities were dissatisfied with the complexity of the application process and the time it took to obtain permission to cross railroad tracks. The utilities also complained that the railroads charged excessive fees for crossings. The utilities proposed a pay-and-go system under which utilities could notify a railroad of a desired crossing, pay a one-time fee, and then move

forward with construction—without awaiting individual review and approval by the railroads. The railroads sought to ensure that utility crossings would be safe and would not create liability for the railroads. The railroads also advocated for their right, as property owners, to set their own fees for railroad crossings. Legislators had introduced and considered bills in the house and senate relating to these issues, and the resolution sought additional input from the interested parties. *Id.*

Hawkeye Land was actively involved in the resulting discussions. Hawkeye Land owns the right to grant easements along more than two thousand miles of Iowa railroad track, but does not own the railroad track itself. It purchased this property right in 1985, during bankruptcy proceedings for the Chicago, Rock Island and Pacific Railroad. The bankruptcy trustee separated ownership of the physical railroad tracks from the right to grant easements along and across the tracks. The Union Pacific Railroad Company now owns the railroad tracks used by its freight trains. Hawkeye Land has never owned or managed a railroad.

Hawkeye Land wrote a letter to IUB in August 2000 presenting its position on railroad-crossing issues. Hawkeye Land noted that easement fees were the company's revenue source and commented: "Hawkeye incurs costs in generating those easements and when one considers the lack of regard for a recorded document and the exposure that Hawkeye incurs because of this ignorance, overall the revenue does not match the risk." Hawkeye Land offered to meet with IUB and the other parties to discuss crossing issues.

Both the railroads and the utilities acknowledged Hawkeye Land as an interested party. The Iowa Utility Association pointed to Hawkeye Land as a source of the problems they identified; namely, that Hawkeye Land's crossing application process took too long and it charged

exorbitant fees. The railroads summarized the progress the railroads and utilities had made in negotiations. Under the topic of "Absentee Managers/Land Management Companies," the railroads commented "Hawkeye is a unique situation that the Railroads are powerless to address, but it appears that Hawkeye is at the table and will participate in resolving the issues."

In a report to Iowa legislators on October 31, 2000, IUB summarized the positions of the stakeholders who had provided input: (1) the utilities, (2) the railroads, and (3) Hawkeye Land. IUB described Hawkeye Land's position as follows:

> In 1985 Hawkeye purchased the right to grant utility easements along the former Chicago, Rock Island and Pacific Railroad corridor and, as such, became a third party to the discussions. Hawkeye stated it is a party with a verified, recorded interest in the property and that it incurs certain costs associated with the easements. It was supportive of meeting to begin resolution of the issues.

The parties met several more times in 2001, with the goal of adopting a "master crossing agreement" to govern all of the interested parties. The meetings were productive, with the parties reaching agreement on most issues. Significantly, the railroads agreed to the adoption of a standardized pay-and-go crossing procedure. The parties, however, reached an impasse on the issues of insurance, indemnity, and compensation for crossings. Consequently, the parties failed to adopt a master agreement. IUB reported in January 2001, "It is our understanding that the utilities may now work for legislation on crossing issues."

Indeed, a bill "providing for the crossing of railroad rights-of-way by public utilities" was introduced that year and enacted into law. S.F. 515, 79th G.A., Reg. Sess. (Iowa 2001); 2001 Iowa Acts ch. 138

(codified at Iowa Code § 476.27). The legislation created the framework for a pay-and-go process and empowered IUB to adopt rules prescribing the terms and conditions for a crossing. Iowa Code § 476.27(2). The administrative regulations governing crossing are found in Iowa Administrative Code rule 199—42. Pursuant to section 476.27 and its related regulations, a public utility can erect a crossing over a railroad right-of-way by submitting a notification of intent to construct and paying a one-time standard crossing fee of seven hundred fifty dollars for each crossing. *See* Iowa Code § 476.27 (2009) (defining relevant terms and setting forth governing rules); Iowa Admin. Code r. 199—42.3 (detailing notice procedures). A railroad can petition IUB for additional compensation if "special circumstances" exist. Iowa Code § 476.27(4). A party who disagrees with IUB's determination of damages may appeal to the district court. *Id.* § 476.27(5)(*a*) (noting the appeal is governed by the general eminent domain procedures in Iowa Code sections 6B.18 .21 through .23).

ITC Midwest was not involved in the discussions that led to the passage of section 476.27, nor were any other independent transmission companies. The Federal Energy Regulatory Commission (FERC) had authorized the creation of independent transmission companies in 1996, but no independent transmission company was operating in Iowa in 2001. *See generally New York v. FERC*, 535 U.S. 1, 122 S. Ct. 1012, 152 L. Ed. 2d 47 (2002) (reviewing the evolution of federal energy regulation, discussing the impact of FERC Order 888, and upholding federal regulation of independent transmission companies). Historically, public utility companies were vertically integrated and maintained their own transmission assets. *Id.* at 5, 122 S. Ct. at 1016–17, 152 L. Ed. 2d at 55. The 1996 FERC action allowed utility companies to unbundle their rates

with regard to wholesale generation, transmission, and ancillary services. *Id.* at 11, 122 S. Ct. at 1019–20, 152 L. Ed. 2d at 58. The Iowa legislature acknowledged the creation of independent transmission companies in 2003 when it enacted Iowa Code section 390.8, entitled "Equity investment in independent transmission company." 2003 Iowa Acts ch. 116, § 1 (codified at Iowa Code § 390.8). That section allows "any city operating a city electric utility [to] enter into agreements with and acquire equity interests in independent transmission companies." *Id.*

IUB recognized ITC Midwest as an independent transmission company in 2007. That year, IUB gave ITC Midwest its approval to purchase the electric transmission assets of Interstate Power and Light Company (IPL). *See Interstate Power & Light Co.*, Iowa Utils. Bd. Docket No. SPU–07–11 at 84–85 (Sept. 20, 2007), *available at* http://www.state.ia.us/government/com/util/docs/orders/2007/0920_SPU0711.pdf. At that time, ITC Holdings, ITC Midwest's corporate parent, was "the only, publicly traded company engaged exclusively in transmission in the United States." *Id.* at 2. Independent transmission companies are federally—not state—regulated. *Id.* at 58–59. Because independent transmission companies are regulated by FERC, IUB's decision in 2007 to allow the sale of IPL's transmission assets to ITC Midwest deprived IUB of jurisdiction over those assets. *Id.* As IUB explained then, "FERC will affirmatively exercise jurisdiction over ITC Midwest's transmission charges to IPL's retail customers because those transmission charges will no longer be part of a vertically integrated utility's bundled rate." *Id.*

IUB acknowledged that it lacked jurisdiction over ITC Midwest under Iowa Code chapter 476 because ITC Midwest is not a public utility,

but noted chapter 478 gives IUB jurisdiction over electric transmission lines. *Id.* at 59; *see also* Iowa Code § 478.18(1) ("The utilities board shall have power of supervision over the construction of a transmission line and over its future operation and maintenance."); *id.* § 478.12 (providing that any person who owns, obtains, or operates a transmission line is deemed "to have consented to such reasonable regulation as the utilities board may, from time to time, prescribe"). One IUB member dissented, citing concerns "that the Board will have reduced ability to directly influence transmission issues because of the loss of rate regulation authority." *Id.* at 89. The dissenter also noted "this Board is perceived as being more accessible than FERC." The debate over IUB's jurisdiction over independent transmission companies in that administrative proceeding foreshadows the fighting issue today: whether ITC Midwest is a "public utility" as defined in the crossing statute.[1] *Id.*

---

[1]Twenty-four parties intervened in the 2007 action. *Interstate Power & Light Co.*, Iowa Utils. Bd. Docket No. SPU–07–11 at 3. The majority were other energy companies. *Id.* Most objected to the sale to ITC Midwest. *Id.* at 11–14. Several objected that the sale would diminish IUB's ability to protect the interests of Iowa consumers. *Id.* Many predicted that the cost of transmitting electricity would increase, resulting in higher prices for Iowa consumers. *Id.* As the Municipal Coalition—which represented the Iowa Association of Municipal Utilities, Midwest Municipal Transmission Group, Missouri River Energy Services, and Wisconsin Public Power, Inc.—explained,

> [IUB] will have no choice but to pass FERC rates through to retail ratepayers, even if [IUB] disagrees with the high returns allowed by the FERC formula. . . . [A]ny protests to the rate would have to be at FERC, where the burden is on those protesting the rate; in Iowa, the burden is on the utility to prove the rate is just and reasonable.

*Id.* at 55.

IUB approved the sale because it concluded the "substantial" benefits of the sale outweighed these costs. *Id.* at 81–82. IUB concluded that the sale would "most likely . . . have a negative net present value to ratepayers. . . . [I]t is likely that the transmission component of IPL's retail rates will be slightly higher as a result of this transaction, if approved." *Id.* at 47. But, emphasizing the importance of transmission investment, IUB concluded "ITC Midwest is better positioned than IPL to move forward on new transmission projects, in part because ITC Midwest is a transmission-only company and will not have to compete for investment with other business units, such as generation and distribution." *Id.* at 81–82. IUB predicted that these investments

**B. The Dispute Between ITC Midwest and Hawkeye Land.**

Against this backdrop, we now turn to the present dispute. In the spring of 2009, ITC Midwest sought to erect three power line crossings that would intersect railroad tracks owned and operated by Union Pacific in Franklin County. Hawkeye Land owns the right to grant easements along those railroad tracks, subject to Union Pacific's approval. ITC Midwest complied with the procedures set forth in Iowa Code section 476.27 and Iowa Administrative Code chapter 199—42. ITC Midwest first obtained permission for the crossings from IUB. The company then sent engineering drawings to Union Pacific, which approved the crossing plans. After receiving this approval, ITC Midwest sent Hawkeye Land three $750 statutory payments and notification of the planned crossing construction. Hawkeye Land refused the tendered payments. ITC Midwest, nevertheless, proceeded to construct the three crossings as permitted by the pay-and-go procedure of section 476.27.

On August 7, 2009, Hawkeye Land filed a formal complaint with IUB regarding these three crossings. Hawkeye Land's complaint alleged: (1) IUB did not have jurisdiction over Hawkeye Land because Hawkeye Land is not a "railroad" or "railroad corporation" as defined in Iowa Code section 476.27; (2) $750 was inadequate compensation for each of the

---

would have positive impacts on prices for all electricity users. *Id.* at 82. IUB further stated:

> One of the most significant benefits is that the transmission system will be under the control of an independent operator. An independent operator has no motive to discriminate in favor of or against any transmission system user, because the independent transmission operator is not a market participant. This should benefit small producers, renewable energy, and other wholesale users of the transmission system. The ratepayer and public benefits of this transaction far outweigh the upfront costs to Iowa ratepayers.

*Id.* at 82. IUB's analysis highlights difference between independent transmission companies and traditional public utilities that are vertically integrated with their own transmission assets.

crossings ITC Midwest constructed and special circumstances existed justifying a higher fee; and (3) the statutorily prescribed one-time fee of $750 "is an unlawful and an unjust and unreasonable taking and therefore the public utility must use its condemnation rights and procedures." IUB assigned the complaint to an ALJ who conducted an evidentiary hearing. Hawkeye Land introduced evidence of other easement sales to support its claim that $30,000 was just compensation for each crossing. The following parties intervened in the administrative proceedings: The Iowa Association of Electric Cooperatives, the Iowa Association of Municipal Utilities, IPL, MidAmerican Energy Company, Black Hills Energy, NextEra Energy Resources, the Iowa Rural Water Association, the City of Des Moines, the Des Moines Metropolitan Wastewater Reclamation Authority, and the Consumer Advocate of the Iowa Department of Justice.

On October 14, 2010, the ALJ issued a proposed decision that rejected Hawkeye Land's claims. The ALJ denied Hawkeye Land any relief above the $750 per crossing fee because it concluded there was "nothing unusual" about the crossings. The ALJ described the crossings:

> Each of the three crossings in this case consists of four wires running across the railroad right-of-way. There are no poles in the right-of-way. The evidence shows that each crossing involves a standard 161 kV transmission line. At the most, the utility requires 10 feet on either side of each line to accommodate sway, for a total maximum width of each crossing where the lines exist of 20 feet.

The ALJ concluded the three crossings did not interfere with the construction of longitudinal easements and, therefore, did not lessen the value of Hawkeye Land's property interest.

Hawkeye Land appealed the proposed decision to IUB. Hawkeye Land contended: the ALJ erred (1) in finding the crossing statute applies

to Hawkeye Land's property interest; (2) by declining to award Hawkeye Land more than $750 for each crossing; and (3) by declining to award Hawkeye Land fees and litigation expenses. IUB broadened the scope of the issues to include the question of whether ITC Midwest is a "public utility" as defined by Iowa Code section 476.27, and the parties filed supplemental briefing on this issue.

On September 20, 2011, after considering the positions of Hawkeye Land, ITC Midwest, and the intervenors, IUB issued a final order. IUB first concluded it has interpretive authority over Iowa Code section 476.27. "In the exercise of [that] discretion," IUB ruled ITC Midwest is entitled to use the pay-and-go procedure of Iowa Code section 476.27. IUB acknowledged that ITC Midwest does not meet the definition of "public utility" because it is an independent transmission company. IUB noted ITC Midwest had, in fact, previously resisted being classified as a public utility for purposes of state regulation. Yet, IUB concluded the legislature intended section 476.27 to cover companies that, like ITC Midwest, carry electricity "primarily, if not exclusively" for public utilities. IUB next ruled Hawkeye Land is subject to section 476.27 because it is a "railroad corporation's successor in interest," and it owns an "interest in real estate" that is occupied or managed by or on behalf of a railroad corporation. IUB ruled $750 was just compensation for each of the three Franklin County crossings because the crossings were standard and no special circumstances existed. Finally, IUB declined to award Hawkeye Land attorney fees and litigation expenses.

Hawkeye Land filed two appeals from IUB's ruling. Section 476.27(5)(*a*) states an appeal regarding IUB's damage determination may be appealed "to the district court in the same manner as provided in section 6B.18 and sections 6B.21 through 6B.23." Iowa Code

§ 476.27(5)(*a*)   In turn, Iowa Code section 476.27(5)(*b*) provides: "An appeal of any determination of the board other than the issues of damages for rights granted to a public utility shall be pursuant to chapter 17A." Accordingly, Hawkeye Land's first appeal to the district court challenged IUB's refusal to award damages beyond the $750 crossing fees, pursuant to chapter 6B, the general condemnation statute. This action was stayed by the district court. In a separate action, Hawkeye Land appealed IUB's other rulings to the district court pursuant to chapter 17A and again challenged the $750 fee authorized by section 476.27 as an unconstitutional taking. On December 31, 2011, the district court affirmed IUB's rulings and rejected Hawkeye Land's constitutional argument. Hawkeye Land appealed, and we retained the appeal. Hawkeye Land, ITC Midwest, IUB, the Consumer Advocate, and seven intervenors filed appellate briefs on the merits.[2]

**II.  Scope of Review.**

The crossing statute provides that judicial review of IUB's rulings on all issues other than the amount of damages "shall be pursuant to chapter 17A." *Id.* § 476.27(5)(*b*). Iowa Code section 17A.19(10) governs judicial review of an agency ruling. *See Iowa Med. Soc'y v. Iowa Bd. of Nursing*, 831 N.W.2d 826, 838 (Iowa 2013). The district court reviews the agency's decision in an appellate capacity. *Id.* In turn, " '[w]e review the district court's decision to determine whether it correctly applied the law.' " *Id.* (quoting *City of Sioux City v. GME, Ltd.*, 584 N.W.2d 322, 324 (Iowa 1998)). "We must apply the standards set forth in section

_____

[2]A joint brief was filed on behalf of the following intervenors: Iowa Association of Electric Cooperatives, Iowa Association of Municipal Utilities, Iowa Rural Water Association, MidAmerican Energy Company, and IPL. Two other intervenors, the City of Des Moines and the Des Moines Metropolitan Wastewater Reclamation Authority, joined the briefs of all the appellees.

17A.19(10) and determine whether our application of those standards produce[s] the same result as reached by the district court." *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 589 (Iowa 2004). "The burden of demonstrating the . . . invalidity of agency action is on the party asserting invalidity." Iowa Code § 17A.19(8)(*a*).

A threshold question is the deference owed to IUB's interpretation of the crossing statute. If the legislature has clearly vested the agency with authority to interpret the relevant statute, we give deference and reverse only if the agency's interpretation is "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(*l*); *see, e.g., Iowa Med. Soc'y,* 831 N.W.2d at 838 (concluding "[t]he legislature has clearly vested the nursing board with rulemaking and interpretive authority for Iowa Code chapter 152"). If the agency lacks interpretive authority, "we review for erroneous interpretations of law." *Iowa Dental Ass'n v. Iowa Ins. Div.*, 831 N.W.2d 138, 142–43 (Iowa 2013) (citing Iowa Code § 17A.19(10)(*c*)). In *Renda v. Iowa Civil Rights Commission*, we noted, "The question of whether interpretive discretion has clearly been vested in an agency is easily resolved when the agency's enabling statute explicitly addresses the issue." 784 N.W.2d 8, 11 (Iowa 2010). No provision in chapter 476, however, expressly gives IUB interpretive authority over the crossing statute.

Resolution of this appeal turns on the meaning of terms in section 476.27—specifically, "public utility" and "railroad corporation." We must therefore determine if the legislature clearly vested IUB with authority to interpret these terms. *See NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 36–37 (Iowa 2012). The focus of our inquiry is narrow— we must decide only if IUB has been vested with the authority to define the disputed terms in Iowa Code section 476.27. *See, e.g., id.* at 37

("[W]e must determine whether the general assembly explicitly vested the Board with the authority to interpret *specific terms* in chapter 476." (Emphasis added.)); *Renda*, 784 N.W.2d at 12 ("It is conceivable that the legislature intends an agency to interpret certain phrases or provisions of a statute, but not others."). To conclude that IUB is clearly vested with the authority to interpret the disputed terms, we

> "must have a firm conviction from reviewing the precise language of the statute, its context, the purpose of the statute, and the practical considerations involved, that the legislature actually intended (or would have intended had it thought about the question) to delegate to the agency interpretive power with the binding force of law over the elaboration of the provision in question."

*Renda*, 784 N.W.2d at 11 (quoting Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 63 (1998)).

Our caselaw analyzing whether IUB has interpretive authority illustrates that this issue is "not conducive to the development of bright-line rules." *Id.* at 12. In cases involving section 476.103, we have held the legislature clearly vested IUB with interpretive authority. *See Evercom Sys., Inc. v. Iowa Utils. Bd.*, 805 N.W.2d 758, 762–63 (Iowa 2011); *Office of Consumer Advocate v. Iowa Utils. Bd.*, 744 N.W.2d 640, 643 (Iowa 2008). We concluded in those cases that "[t]he legislature's requirement [in section 476.103(3)] that the Board 'adopt rules prohibiting an unauthorized change in telecommunication service' evidences a clear legislative intent to vest in [IUB] the interpretation of the unauthorized-change-in-service provisions in section 476.103." *Office of Consumer Advocate*, 744 N.W.2d at 643. By contrast, in *NextEra Energy*, we concluded the legislature did not grant IUB interpretative authority over section 476.53(4)(*c*)(2). 815 N.W.2d at 38. We recognized

that section 476.2(1) grants IUB "broad general powers to carry out the purposes of chapter 476." *Id.* at 37. But, we noted

> simply because the general assembly granted the Board broad general powers to carry out the purposes of chapter 476 and granted it rulemaking authority does not necessarily indicate the legislature clearly vested authority in the Board to interpret all of chapter 476.

*Id.* at 38. With no clear indication the legislature intended to vest IUB with interpretive authority over section 476.53(4)(*c*)(2), we reviewed IUB's interpretation of that section for correction of errors at law. *Id.* These cases highlight the importance of focusing on the specific statutory terms interpreted by the agency.

IUB's authority under section 476.27 makes this case more like *NextEra Energy,* with IUB lacking interpretive authority over terms in the crossing statute. First, section 476.27(1) contains definitions of "public utility" and "railroad." This is an obstacle to finding IUB has authority to interpret these terms. *See Sherwin-Williams Co. v. Iowa Dep't of Revenue,* 789 N.W.2d 417, 423–24 (Iowa 2010) ("The insurmountable obstacle to finding the department [of revenue] has authority to interpret the word 'manufacturer' in this context is the fact that this word has already been interpreted, i.e., explained, by the legislature through its enactment of a statutory definition.").

Second, the fact that section 476.27 delegates the state's power of eminent domain has constitutional implications and therefore cuts against granting IUB broad interpretative authority over the crossing statute. *See Hardy v. Grant Twp. Trs.*, 357 N.W.2d 623, 625 (Iowa 1984) (noting the "power of eminent domain is an attribute of sovereignty which may be delegated only by express authorization of the legislature"). Statutes that delegate the power of eminent domain "should be strictly

construed and restricted to their expression and intention." *Id.* at 626. Moreover, "we review constitutional issues in agency proceedings de novo." *NextEra Energy*, 815 N.W.2d at 44.

Third, though section 476.27(2) empowers IUB to adopt rules "prescribing the terms and conditions for a crossing," it requires IUB to do so "in consultation with" the Iowa Department of Transportation (IDOT). Iowa Code § 476.27(2). This indicates IUB does not have the exclusive authority to administer the crossing statute, but rather, shares decision making authority with IDOT. *Cf. Iowa Med. Soc'y*, 831 N.W.2d at 841 ("If the legislature had intended to give another agency or organization the power to determine recognition by the medical profession, it would have said so in this provision."). Furthermore, "we have not concluded that a grant of mere rulemaking authority gives an agency the authority to interpret *all* statutory language." *Renda*, 784 N.W.2d at 13.

For these reasons, we hold IUB lacks interpretive authority as to the crossing statute. Accordingly, we review IUB's interpretation of the disputed terms in section 476.27 for correction of errors at law.

### III. Analysis.

Hawkeye Land raises several grounds for reversing the district court and IUB. First, Hawkeye Land asserts the crossing statute does not apply to it or to ITC Midwest. Second, Hawkeye Land alternatively argues the pay-and-go procedure of Iowa Code section 476.27 violates the takings clause of article I, section 18 of the Iowa Constitution. Hawkeye Land further argues it is entitled to attorney fees, appraisal costs, and direct expenses. Because we conclude the crossing statute does not apply to ITC Midwest, we need not reach, and do not decide, the constitutional question.

An overview of the crossing statute facilitates our discussion of the sequence of the issues to be adjudicated. As noted, Iowa Code section 476.27 creates a pay-and-go procedure by which public utilities can exercise eminent domain powers to get electricity across railroad tracks. Essentially, section 476.27 allows a public utility to circumvent the eminent domain proceedings required by Iowa Code chapter 6B and instead condemn the utility crossing by satisfying certain notification requirements and paying a standard crossing fee of $750. Iowa Code § 476.27(2)(*b*); Iowa Admin. Code r. 199—42.3(1) (requiring public utility to "submit to the railroad a notification of intent to construct, along with a specification exhibit that shows the location of the crossing and the railroad's property, tracks, and wires that the public utility's facilities will cross"). A railroad or its successor in interest may petition IUB for additional compensation if special circumstances exist and can appeal IUB's determination of damages to the district court. *Id.* § 476.27(4), (5)(*a*).

These procedures implicate article I, section 18 of the Iowa Constitution, which provides in pertinent part:

> Private property shall not be taken for public use without just compensation first being made, or secured to be made to the owner thereof, as soon as the damages shall be assessed by a jury, who shall not take into consideration any advantages that may result to said owner on account of the improvement for which it is taken.

Iowa Const. art. I, § 18.[3] The power of eminent domain is a creature of statute, constitutionally limited by article I, section 18 for the protection of private property rights:

---

[3]The Federal Takings Clause provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

> "[A] party seeking to take land by eminent domain must first satisfy the court that it has been authorized by the legislature to exercise the power, that the statute purporting to grant such authority is constitutional, that the conditions exist under which it was provided that the authority might be exercised, and that the condemning party has complied with the requirements of the statute."

*State v. Johann*, 207 N.W.2d 21, 23–24 (Iowa 1973) (quoting 1 Julius L. Sackman, *Nichols' The Law of Eminent Domain* § 4.101(2) (rev. 3d ed. 1964) [hereinafter Nichols']). Hawkeye Land argues the pay-and-go procedure in the crossing statute is unconstitutional because (1) no jury or neutral fact finder determines the amount of just compensation; and (2) the property right is taken first by the condemner for a token $750 payment, without security, and the burden shifts to the property owner to seek additional compensation after the taking has occurred.

We first consider Hawkeye Land's arguments that the crossing statute does not apply to it or ITC Midwest. Whether the statute applies turns on the definitions of several terms in section 476.27. If this case may be resolved on statutory grounds, we need not reach Hawkeye Land's constitutional argument. *See State v. Seering*, 701 N.W.2d 655, 663 (Iowa 2005) (recognizing our "duty to avoid constitutional questions not necessary to the resolution of an appeal"); *State v. Button*, 622 N.W.2d 480, 485 (Iowa 2001) ("Ordinarily we will not pass upon constitutional arguments if there are other grounds on which to resolve the case.").

Iowa Code section 476.27 allows public utilities to use its pay-and-go procedure to cross railroad right-of-ways. Hawkeye Land argues it is not a "railroad" or "railroad corporation," as defined by section 476.27(1)(*f*), and ITC Midwest is not a "public utility," as defined by section 476.27(1)(*e*). We will consider each of these statutory arguments in turn. *See N. Natural Gas Co. v. Iowa Utils. Bd.*, 679 N.W.2d 629, 633

(Iowa 2004) ("The question of jurisdiction by the Utilities Board over this controversy is one of statutory interpretation.").

In interpreting the terms in section 476.27, our goal is to ascertain the legislature's intent. *See NextEra Energy*, 815 N.W.2d at 39.

> We are guided in that determination by well-established principles. First, legislative intent is expressed by what the legislature has said, not what it could or might have said. When a statute's language is clear, we look no further for meaning than its express terms. Intent may be expressed by the omission, as well as the inclusion, of statutory terms. Put another way, the express mention of one thing implies the exclusion of other things not specifically mentioned.

*State v. Beach*, 630 N.W.2d 598, 600 (Iowa 2001) (citations omitted). "We 'may not extend, enlarge or otherwise change the meaning of a statute' under the guise of construction." *NextEra Energy*, 815 N.W.2d at 39 (quoting *Auen*, 679 N.W.2d at 590).

Furthermore, we are interpreting a statute that delegates the power of eminent domain, and such statutes "should be strictly construed." *Hardy*, 357 N.W.2d at 626; *see also Johann*, 207 N.W.2d at 24 ("We have consistently maintained, however, that statutes providing for the exercise of eminent domain must be strictly complied with and restricted to their expression and intent.").

**A. Is Hawkeye Land a "Railroad" or "Railroad Corporation" Under Iowa Code Section 476.27?** Hawkeye Land argues it is not subject to section 476.27 because it does not own or operate a railroad and is not a "successor in interest" to a "railroad corporation." *See* Iowa Code § 476.27(1)(*f*). "[O]ur first task is to look to the language of the statute to determine the legislative intent." *State v. DeCamp*, 622 N.W.2d 290, 294 (Iowa 2001). Section 476.27(1)(*f*) provides: " '*Railroad*' or '*railroad corporation*'. . . is the owner, operator, occupant, manager, or agent of a railroad right-of-way *or the railroad corporation's successor in*

*interest."* Iowa Code § 476.27(1)(*f*) (second emphasis added). Section 476.27(1)(*g*) defines a *"Railroad right-of-way"* as "one or more of the following:"

> (1) A right-of-way or *other interest in real estate* that is owned or operated by a railroad corporation, the trustees of a railroad corporation, *or the successor in interest of a railroad corporation.*
>
> (2) A right-of-way or *other interest in real estate* that is occupied or managed by or on behalf of a railroad corporation, the trustees of a railroad corporation, *or the successor in interest of a railroad corporation,* including an abandoned railroad right-of-way that has not otherwise reverted pursuant to chapter 327G.
>
> (3) Another interest in a former railroad right-of-way that has been acquired or is operated by a land management company or similar entity.

*Id.* § 476.27(1)(*g*) (emphasis added).

Hawkeye Land's property interest does not fit neatly within the plain language of section 476.27(1)(*g*)(3) because the railroad right-of-way at issue in this case is active, not a "*former* railroad right-of-way." *Id.* (emphasis added). Union Pacific, a railroad corporation, currently owns and operates the train tracks. But, we conclude the property right Hawkeye Land owns—the right to grant easements along or across these railroad tracks—is an "other interest in real estate" within the meaning of sections 476.27(1)(*g*)(1) and 476.27(1)(*g*)(2).

We next address whether Hawkeye Land is "the successor in interest of a railroad corporation" as required by sections 476.27(1)(*g*)(1) and 476.27(1)(*g*)(2). *See id.* The crossing statute does not contain a definition of "successor in interest." *See id.* "There is, and can be, no single definition of 'successor' which is applicable in every legal context." *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 264 n.9, 94 S. Ct. 2236, 2243 n.9, 41 L. Ed. 2d 46, 56 n.9 (1974). A party

"may be a successor for some purposes and not for others." *Id.* The question of whether a party is a successor in interest must be determined in light of the interests of the parties involved and the policy behind the applicable law. *See id.* at 256, 94 S. Ct. at 2240, 41 L. Ed. 2d at 53 ("Particularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate."); *see also, e.g., Leib v. Ga.-Pac. Corp.*, 925 F.2d 240, 247 (8th Cir. 1991) (holding "the district court erred in focusing exclusively on whether there was continuity of ownership or control in determining whether Georgia–Pacific was a successor in interest under the veterans' reemployment rights statute"). The question is successor to what interest? Here, it is the easement rights to cross the railroad tracks.

Hawkeye Land argues the term "successor in interest" has a specific, limited meaning. Hawkeye Land cites the definition we quoted in *Grundmeyer v. Weyerhaeuser Co.*, 649 N.W.2d 744, 751 (Iowa 2002). In that case, we stated:

> A successor in interest has been defined as
>
> "[o]ne who follows another in ownership or control of property. In order to be a 'successor in interest,' a party must continue to retain the same rights as [the] original owner without [a] change in ownership and there must be [a] change in form only and not in substance. . . . In [the] case of corporations, the term ordinarily indicates statutory succession as, for instance, when [a] corporation changes its name but retains the same property."

*Grundmeyer*, 649 N.W.2d at 751 (quoting *Black's Law Dictionary* 1431–32 (6th ed. 1990)). We applied that definition in *Grundmeyer* to determine if the purchaser of a manufacturing plant was liable for the debts and liabilities of the transferor. *Id.*

Hawkeye Land argues that it does not satisfy the *Grundmeyer* definition because it does not have the same rights as the original railroad owner, the Chicago, Rock Island and Pacific Railroad. Hawkeye Land asserts it "is a mere transferee of substantially different rights." Hawkeye Land claims "a railroad never owned Hawkeye's Land property because the [bankruptcy] trustee created" the easement rights Hawkeye now owns. Hawkeye Land further argues it is not a successor to a railroad corporation because it did not purchase its property rights *directly* from the Chicago, Rock Island and Pacific Railroad. When that railroad went through bankruptcy, the bankruptcy trustee separated the easement rights from the fee and transferred those easement rights to Chicago Pacific Corporation. It was Chicago Pacific Corporation that in turn deeded the easement rights to Hawkeye Land. Hawkeye Land argues it is therefore a remote transferee, not a successor in interest. Hawkeye Land claims the legislature knew Hawkeye Land was "an independent property owner," and if the legislature had intended to cover Hawkeye Land, it would have included "mere transferees" in the definition of "railroad corporation." In support of this argument, Hawkeye Land points to Iowa Code section 327G.62, which governs disagreements between "a railroad corporation, its grantee, or its successor in interest" and a person with property on a railroad right-of-way. Hawkeye Land asserts this section demonstrates the legislature distinguishes between a successor in interest and a grantee. Hawkeye Land believes it is akin to a railroad grantee, which is not covered by section 476.27.

We conclude the definition of successor in *Grundmeyer* is not controlling. *Grundmeyer* was concerned with rights and liabilities of a corporate successor operating a manufacturing plant. 649 N.W.2d at

751. Here, the relevant statute concerns a specific property right: the right to grant easements over railroad tracks. That property right had been owned by a railroad before Hawkeye Land obtained the right through the railroad's bankruptcy trustee's transferee. In the context of the crossing statute, it is clear that "successor in interest" in section 476.27(1)(*g*) is intended to address the concept of successorship in terms of ownership of that property right—the right to cross railroad tracks—and is not limited to ownership of a railroad. Accordingly, we hold that Hawkeye Land, as owner of the right to grant easements across railroad tracks—a property right previously held by a railroad—is a successor in interest under section 476.27(1)(*g*). It is immaterial that Hawkeye obtained the easement rights from an entity created by the railroad's bankruptcy trustee rather than directly from a railroad.

We are not persuaded by Hawkeye Land's arguments to the contrary. If the right to grant easements had never been separated from ownership of the remaining fee, Union Pacific would be required to comply with section 476.27 as the railroad owning the tracks. Separating the right to grant easements from the bundle of property rights does not exempt the easement from section 476.27. We also reject the notion that the owner must obtain its property rights directly from a railroad in order to be a successor in interest to a railroad corporation. Under Hawkeye Land's interpretation of section 476.27, a railroad could avoid the pay-and-go procedure by using a straw man to transfer ownership of a crossing easement to a third party. We will not open such a loophole. Rather, we are to " 'seek a reasonable interpretation which will best effectuate the purpose of the statute.' " *State v. Walker*, 804 N.W.2d 284, 290 (Iowa 2011) (quoting *State v. Johnson*, 528 N.W.2d 638, 640 (Iowa 1995)).

The legislative history of section 476.27 reinforces our conclusion that the legislature intended that statute to cover Hawkeye Land. Hawkeye Land participated in the meetings and discussions leading up to the passage of section 476.27. The legislature was aware of Hawkeye Land's existence and its interest in the railroad crossings, which explains why the legislature did not simply limit the ambit of section 476.27 to railroads. The legislature knew Hawkeye Land had purchased the right to grant easements indirectly from the Chicago, Rock Island and Pacific Railroad. By defining "railroad right-of-way" broadly to include successors in interest to railroad corporations, the legislature ensured the procedures of section 476.27 could not be avoided by conveying crossing easements to separate entities.

The disputed crossings thus involve a "railroad right-of-way" as defined by section 476.27(1)(*g*)(1) because Hawkeye Land is a "successor in interest to a railroad corporation" and owns an "other interest in real estate." Iowa Code § 476.27(1)(*g*)(1). The definition of "railroad right-of-way" in section 476.27(1)(*g*)(2) is also satisfied because the disputed crossings are an "other interest in real estate" that is managed on behalf of a "successor in interest to a railroad corporation." *Id.* § 476.27(1)(*g*)(2). Accordingly, we hold Hawkeye Land's easement-crossing rights are subject to section 476.27.

**B. Is ITC Midwest a "Public Utility" Under Iowa Code Section 476.27?** We now turn to Hawkeye Land's second argument that the crossing statute is inapplicable. Hawkeye Land asserts ITC Midwest has not been authorized by the legislature to exercise the power of eminent domain under section 476.27 because ITC Midwest is not a "public utility" as defined by section 476.27(1)(*e*). *See Johann,* 207 N.W.2d at 23–24 (stating "a party seeking to take land by eminent domain must

first satisfy the court that it has been authorized by the legislature to exercise the power").

Several subsections of the crossing statute use the term "public utility." A "crossing" is defined as "the construction, operation, repair, or maintenance of a facility over, under, or across a railroad right-of-way *by a public utility*." *Id.* § 476.27(1)(*b*) (emphasis added). The operative language for the pay-and-go provision at issue is found in Iowa Code section 476.27(2)(*b*), which provides: "a *public utility* that locates its facilities within the railroad right-of-way for a crossing . . . shall pay the railroad a one-time standard crossing fee of seven hundred fifty dollars for each crossing." (Emphasis added.) This allows a public utility to effectively condemn easement rights across a railroad for the $750 statutory fee. Iowa Code section 476.27(7), entitled "*Conflicting provisions*," further states:

> Notwithstanding any provision of the Code to the contrary, this section shall apply in all crossings of railroad rights-of-way *involving a public utility as defined in this section*, and shall govern in the event of any conflict with any other provision of law.

(Emphasis added.) Reading section 476.27 as a whole, it is clear that only a public utility, as defined in this statute, may use the pay-and-go procedure.

We must determine whether an independent transmission company such as ITC Midwest is a public utility within the meaning of the crossing statute. As noted, we give no deference to IUB's interpretation of that term. Iowa Code section 476.27(1)(*e*) sets forth this definition:

> *"Public utility"* means a public utility as defined in section 476.1, except that, for purposes of this section, *"public utility"* also includes all mutual telephone companies, municipally owned facilities, unincorporated villages,

waterworks, municipally owned waterworks, joint water utilities, rural water districts incorporated under chapter 357A or 504, cooperative water associations, franchise cable television operators, and persons furnishing electricity to five or fewer persons.

This expanded definition of "public utility" does not mention "independent transmission companies."[4]  Iowa Code section 476.1, which is included by reference in the crossing statute's definition, defines "public utility" as:

[A]ny person, partnership, business association, or corporation, domestic or foreign, owning or operating any facilities for:
    1. Furnishing gas by piped distribution system or electricity to the public for compensation.

*Id.* § 476.1.  ITC Midwest does not furnish electricity directly to the public, but rather, delivers it to electrical utilities who in turn furnish the electricity to end users such as homes and other buildings.

ITC Midwest concedes it is not a public utility as defined in section 476.1.  When IUB gave ITC Midwest approval to purchase the electric transmission assets of IPL in 2007, IUB recognized:

If the reorganization is allowed to go forward, ITC Midwest will not fit within the definition of public utility in Iowa Code chapter 476 because it will not furnish electricity to the public for compensation.  Instead, it will furnish transmission service to IPL and others.

*Interstate Power & Light Co.*, Iowa Utils. Bd. Docket No. SPU–07–11 at 17.[5]  We agree with that determination by IUB.  Under the plain meaning

---

[4]No party contends ITC Midwest is a "person[] furnishing electricity to five or fewer persons" within the meaning of section 476.27(1)(*e*).

[5]IUB recognized that independent transmission companies are outside the definition of public utility and apparently sought to remedy this by passing Iowa Administrative Code rule 199—42.11.  That rule states in relevant part:

The public utility may assign or otherwise transfer any rights to cross railroad right-of-way to any financially responsible entity controlled by, controlling, or under common control with the public utility or to any entity into or with which the public utility is merged or consolidated or

of section 476.1, ITC Midwest is not a public utility because it does not furnish electricity to the public.

Nor do we conclude independent transmission companies such as ITC Midwest fall within the broader definition of "public utility" in section 476.27(1)(*e*). Another rule of statutory construction applies here: "[T]he express mention of one thing implies the exclusion of other things not specifically mentioned." *Beach*, 630 N.W.2d at 600. The legislature included a list of entities that are considered public utilities for the purpose of section 476.27.[6] Notably, the legislature did not state a public utility "includes *but is not limited to*" the entities explicitly listed in section 476.27(1)(*e*). Yet, in a preceding section, "direct expenses" are

---

which acquires ownership or control of all or substantially all of the transmission assets of the public utility.

In its September 30, 2011 ruling, IUB explained the adoption of this regulation:

[IUB] understands that independent transmission companies, such as ITC Midwest, were not operating in Iowa at the time the crossing statute was enacted. However, [IUB] recognized the possibility of independent transmission companies operating in Iowa at the time it promulgated rules concerning the crossings. To address this circumstance, [IUB] adopted rules that allow the transfer of a public utility's right to cross railroad right-of-way to any financially responsible entity that acquires ownership or control of all or substantially all of the transmission assets of a public utility.

IUB may not amend or expand the scope of the crossing statute by rulemaking that adds a new form of entity to the definition of public utility. *See Meredith Outdoor Adver., Inc. v. Iowa Dep't of Transp.*, 648 N.W.2d 109, 117 (Iowa 2002) (noting a "rule must not exceed or limit the scope of the authority granted by the enabling legislation"); *Smith-Porter v. Iowa Dep't of Human Servs.*, 590 N.W.2d 541, 545 (Iowa 1999) ("An agency cannot by rule, however, expand or limit authority granted by statute.").

[6]Hawkeye recognized in 2001 the need for the legislature to specifically define "public utility." In its letter to IUB in response to Resolution 119, Hawkeye wrote:

What is the definition of "utility'" especially public utility, is it Internet cabling, cable television? Since many companies are consolidating their lines to handle Internet, cable and telephone capabilities at once, it would seem that the term of "utility" is being broadened, and only for the benefit of the company installing it.

The list in section 476.27(1)(*e*) appears to be the legislature's attempt to respond to this concern.

defined with a list of examples introduced with the phrase "includes, *but is not limited to*, any or all of the following." Iowa Code § 476.27(1)(*c*) (emphasis added). The use of such a phrase in one definition but not the other indicates the legislature was selective in choosing which list is a closed set. *See Oyens Feed & Supply, Inc. v. Primebank,* 808 N.W.2d 186, 193–94 (Iowa 2011) (concluding the fact that a phrase was "selectively incorporated" in certain provisions showed the legislature's omission of that phrase in related provision was intentional). We conclude the legislature, by omitting the phrase "but not limited to" in section 476.27(1)(*e*), intended to limit the entities considered public utilities to those expressly mentioned. The omission of independent transmission companies from the list in section 476.27(1)(*e*) shows the legislature did not intend to allow such an entity to use the procedure of section 476.27.

Nevertheless, the Consumer Advocate argues ITC Midwest meets the definition of public utility in section 476.1. The Consumer Advocate focuses on the word "furnish" in section 476.1(1). Iowa Code § 476.1(1) (stating a public utility is one who "[f]urnish[es] gas by piped distribution system or electricity to the public for compensation"). The Consumer Advocate defines "furnish" to mean "to provide or supply with what is needed, useful, or desirable." It argues the legislature consciously chose "furnish"—what it argues is a broad word—instead of using more specific verbs that refer to individual functions utility companies commonly perform, like generate, transmit, or distribute.

This argument focuses on the wrong wording. It is not the word "furnish" in section 476.1(1) that controls this issue, it is the phrase "to the public." ITC Midwest does not furnish electricity to the *public*, it furnishes electricity to *public utilities*, which in turn furnish that

electricity to the public. In order to side with ITC Midwest, we would have to read the word "indirectly" into the definition of public utility: A public utility furnishes electricity *indirectly* to the public. We decline to do so. A plain meaning of "to the public" requires that there be a direct transaction between the public utility and the public. *See N. Natural Gas Co.,* 679 N.W.2d at 634 ("Both the [National Gas Policy Act of 1978] and cases interpreting it recognize that states are free to regulate the natural gas industry by state utility commissions or boards in *retail sales to ultimate customers.*" (Emphasis added.)); *see also Iowa State Commerce Comm'n v. N. Natural Gas Co.,* 161 N.W.2d 111, 115 (Iowa 1968) (determining "to the public" means "sales *to sufficient of the public* to clothe the operation with a public interest" (emphasis added)).

The Consumer Advocate disagrees, asserting the *Northern Natural Gas* definition inappropriately limits the plain meaning of section 476.1(1) to those companies that furnish electricity *directly* to the public. The Consumer Advocate argues, "Without any specification as to whether the furnishing is required to be direct or indirect, the intent to cover both possibilities is apparent." The Consumer Advocate cites *Comes v. Microsoft Corp.,* 646 N.W.2d 440, 445 (Iowa 2002), in which we held the Iowa Competition Act does not "restrict the class of persons who may bring suit" to only *direct* purchasers when "[n]othing in the statute says in order to seek redress for antitrust violations a purchaser must be directly injured."

*Comes* is distinguishable. First, section 476.27 delegates the State's power of eminent domain and must be strictly construed. *See Hardy,* 357 N.W.2d at 626. By contrast, the Iowa Competition Act at issue in *Comes* is remedial and is therefore construed broadly to effect its purpose. *Comes,* 646 N.W.2d at 446. Moreover, the competition statute

defined a class of plaintiffs based on a result; namely, injury. *Id.* at 445. That statute, Iowa Code section 553.12, creates a cause of action for "a person who is injured or threatened with injury by conduct prohibited under this chapter." We stated:

> The legislature did not specifically limit standing to direct purchasers, but instead it simply authorized "[a] person who is injured" to sue. . . . Given the clear, broad language of the state antitrust law, we conclude the Iowa Competition Law creates a cause of action for *all* consumers, regardless of one's technical status as a direct or indirect purchaser.

*Comes*, 646 N.W.2d at 445 (citations omitted).

The operative language of section 476.1(1) is narrower. Section 476.1(1) defines a business as a public utility based upon that business's relationship to the public. We will not expand the definition of public utility by allowing an indirect relationship with the public to suffice. *See City of Des Moines v. City of W. Des Moines*, 239 Iowa 1, 7, 30 N.W.2d 500, 504 (1948) ("The authorities quite generally refuse to attempt an all-inclusive definition of the term 'public utility.'").

ITC Midwest concedes it is not a public utility under section 476.1(1), but nevertheless argues it is a public utility as more broadly defined in section 476.27. IUB, ITC Midwest, and the intervenors note that the definitions used in section 476.27 apply "unless the context otherwise requires." Iowa Code § 476.27(1). They argue this case presents a context that requires us—in light of the purpose of the crossing statute—to read the definition of public utility expansively. They next point to section 476.27(7), which the joint utility intervenors describe as a "catch-all" provision. That section provides:

> *Conflicting provisions.* Notwithstanding any provision of the Code to the contrary, this section shall apply in all crossings of railroad rights-of-way *involving a public utility as defined*

*in this section*, and shall govern in the event of any conflict with any other provision of law.

*Id.* § 476.27(7) (second emphasis added). ITC Midwest and the intervenors contend the Franklin County crossings fall within the ambit of section 476.27 because ITC Midwest carries electricity for public utilities and the crossings thus *involve* public utilities. The Consumer Advocate states:

> The fact that the transmission system is now separated from IPL legally does not mean it does not continue to provide services that are vital to the public utility function of the formerly integrated system. Each of the separate parts performs the same service in what is functionally the same system.

We disagree that either the context or catchall provisions support expanding section 476.27 to allow use of the pay-and-go procedure by an entity other than a public utility as defined in that statute. The context of this case does not justify judicially modifying an unambiguous statutory definition, and we do not believe the legislature intended section 476.27(7), a conflict provision, to supersede the operative statutory language in section 476.27(2)(*b*) or the definition of "public utility" in 476.27(1)(*e*). *See Oyens*, 808 N.W.2d at 194 ("To the extent there is a conflict or ambiguity between specific and general statutes, the provisions of specific statutes control." (Internal quotation marks omitted.); *see also* Iowa Code § 4.7. Section 476.27(2)(*b*) allows a public utility—but no other entity—to cross railroad tracks using the pay-and-go procedure, and section 476.27(1)(*e*) defines public utility as a company that furnishes electricity to the public and adds specified additional entities with crossing rights, but not an independent transmission company. Section 476.27(7) governs conflicts between

"this section"—section 476.27—and "any other provision of law."[7]   Iowa Code § 476.27(7).   We will not interpret it to create conflicts *within* section 476.27.

Finally, IUB, ITC Midwest, and the intervenors argue the policy behind section 476.27 requires the inclusion of independent transmission companies.   Quoting section 476.27(2), they assert the purpose of the crossing statute is to promote "public convenience and necessity and reasonable service to the public."   *Id.* § 476.27(2).   They argue ITC Midwest must be able to use the procedures of section 476.27 in order to achieve this purpose.   The joint utility intervenors explain the importance of ITC Midwest's service:

> In general, before the public consumes electricity, the electricity must be generated, transmitted, and then distributed to the public.  An entity may perform one, two or all three of the functions.  ITC performs one: transmission. It is the conduit by which electric companies connect the generation of electricity with the distribution of the electricity to businesses and individuals.

Indeed, IUB found that ITC Midwest carries electricity "primarily, if not exclusively" for public utilities.   IUB, ITC Midwest, and the intervenors argue that preventing ITC Midwest from using the procedures of section 476.27 will impede the delivery of electricity to the public.

IUB, ITC Midwest, and the intervenors suggest that section 476.27's omission of independent transmission companies was a legislative oversight.   They argue the legislature did not explicitly include independent transmission companies within the definition of public utility in section 476.27(1)(*e*) simply because independent transmission companies did not exist in Iowa at the time the legislature enacted Iowa

---

[7]For example, the conflict provision in section 476.27(7) would ensure that the expanded definition of "public utility" in section 476.27(1)(*e*) would apply for railroad crossing issues, not the more limited definition in section 476.1.

Code section 476.27. IUB concludes the "[l]egislature intended, or would have intended had it thought about the question, to include the electric transmission lines of independent transmission companies, such as ITC Midwest, within the provisions of this statute." IUB, ITC Midwest, and the intervenors argue we should judicially correct this oversight by reading independent transmission companies into the statute because such a reading would further the purpose of the statute.

We decline to do so. *See Auen*, 679 N.W.2d at 590 ("We determine legislative intent from the words chosen by the legislature, not what it should or might have said."). There is reason to believe the omission of independent transmission companies from section 476.27(1)(*e*) was no oversight. Though no independent transmission companies operated in Iowa in 2001 when the legislature enacted section 476.27, FERC had authorized the creation of such companies five year earlier. Moreover, the legislature separately addressed independent transmission companies in 2003. *See* 2003 Iowa Acts ch. 116, § 1 (enacting law entitled, "Equity investment in independent transmission company," which allows "any city operating a city electric utility . . . [to] enter into agreements with and acquire equity interests in independent transmission companies"). Yet, the legislature has never amended the definition of public utility in section 476.27(1)(*e*) to add independent transmission companies. If the omission of independent transmission companies from section 476.27 is nothing more than a legislative oversight, we trust the legislature will correct it.

We disagree with IUB's assertion that "[t]here is no rational basis why the sale of transmission lines should affect their status when they continue to be used for the exact same purpose." Transmission of high voltage electricity is a heavily regulated area of law. We find it significant

that independent transmission companies are federally—not state—regulated. IUB acknowledges that its decision in 2007 to allow the sale of IPL's transmission assets to ITC Midwest deprived IUB of jurisdiction over those assets. The legislature is entitled to distinguish between public utilities and independent transmission companies.

We conclude the policy arguments by appellees are trumped by the plain language of the statute. *See* Iowa Code § 476.27(2)(*b*) (allowing a public utility, but no other entity, to cross railroad using pay-and-go procedure); *see also Horsman v. Wahl*, 551 N.W.2d 619, 620–21 (Iowa 1996) ("If the statutory language is plain and the meaning is clear, we do not search for the legislative intent beyond the express terms of the statute."). "Policy arguments to amend the statute should be directed to the legislature." *In re Estate of Whalen*, 827 N.W.2d 184, 194 (Iowa 2013). We reiterate that statutes delegating the power of eminent domain are strictly construed. *Hardy*, 357 N.W.2d at 626. IUB lacks the constitutional authority to extend eminent domain powers to new forms of entities not mentioned by the legislature in section 476.27(1)(*e*). We cannot allow IUB, in the guise of interpretation, to extend the crossing statute's eminent-domain powers to independent transmission companies. To do so would be an unconstitutional delegation of power. "[I]t is 'our mandate to construe statutes in a fashion to avoid a constitutional infirmity where possible.'" *State v. Thompson*, 836 N.W.2d 470, 484 (Iowa 2013) (quoting *In re Young*, 780 N.W.2d 726, 729 (Iowa 2010)). Indeed, "[t]he doctrine of constitutional avoidance suggests the proper course in the construction of a statute may be to steer clear of 'constitutional shoals' when possible." *State v. Iowa Dist. Ct.*, 843 N.W.2d 76, 85 (Iowa 2014). The constitutional-avoidance doctrine

provides another important reason to reject appellees' interpretation of the crossing statute.

We hold ITC Midwest is not a public utility within the meaning of the crossing statute. Accordingly, ITC Midwest cannot " 'satisfy the court that it has been authorized by the legislature to exercise the power' " of eminent domain under section 476.27. *See Johann*, 207 N.W.2d at 24 (quoting 1 Nichols § 4.101(2)). The proceedings before IUB "involved a substantial departure from statutory requirements," and ITC Midwest's application under section 476.27 was "legally insufficient on its face." *Id.* at 25. IUB erred by allowing ITC Midwest to utilize the crossing statute, and the district court erred in affirming IUB's decision on judicial review.

Because we conclude section 476.27 did not authorize ITC Midwest to use the pay-and-go procedure, we need not reach Hawkeye Land's constitutional arguments. *See Seering*, 701 N.W.2d at 663 (noting we will avoid constitutional question when appeal can be decided on other grounds). Iowa Code chapter 6B governs the compensation owed Hawkeye Land for the crossing easements taken by ITC Midwest, as well as the related claims for attorney fees, costs and expenses. *See* Iowa Code § 478.15 (allowing companies running electric transmission lines to use "the same proceedings . . . as provided for taking private property for works of internal improvement" if the company cannot reach an agreement with a property owner); *id.* § 6B.1A (stating chapter 6B provides procedures "for the condemnation of private property for works of internal improvement, and for other public projects, uses, or purposes"). Compensation and entitlement to fees cannot be determined until the procedures of chapter 6B are invoked.

**IV.  Disposition.**

For the foregoing reasons, we reverse the district court's order that affirmed IUB's ruling in favor of ITC Midwest under Iowa Code section 476.27.  We remand this case for entry of an order by the district court directing IUB to vacate its decision.

**REVERSED.**