**IN THE COURT OF APPEALS OF IOWA**

No. 17-0493
Filed April 18, 2018

**HAWKEYE LAND COMPANY,**
    Plaintiff-Appellant,

**vs.**

**CITY OF IOWA CITY, IOWA,**
    Defendant-Appellee,

**and**

**IOWA INTERSTATE RAILROAD, LTD.,**
    Intervening Defendant/Intervening Counter-Plaintiff-Appellee.
_____

Appeal from the Iowa District Court for Johnson County, Sean W. McPartland,

Judge.


Hawkeye Land Company appeals from an adverse judgment in its claims against

the City of Iowa City and the intervening party, Iowa Interstate Railroad, Ltd.  **AFFIRMED.**


Andrew Potter, Cedar Rapids, and Jon M. McCright and Matthew J. Nagle of Lynch

Dallas, P.C., for appellant.

Eric R. Goers, Assistant City Attorney, Iowa City, for appellee city.

Stephen J. Rynn and James D. Helenhouse of Fletcher & Sippel LLC, Chicago,

Illinois, and Onna B. Houck, Cedar Rapids, for appellee railroad.


Heard by Danilson, C.J., and Vaitheswaran and Bower, JJ.

**DANILSON, Chief Judge.**

Hawkeye Land Company appeals from an adverse judgment in its claims against the City of Iowa City and an intervening party, Iowa Interstate Railroad, Ltd. The central issue is which entity—Hawkeye Land Company or Iowa Interstate Railroad, Ltd.—has the right to grant at-grade crossings in Iowa City.[1] The district court found in favor of Iowa Interstate Railroad, Ltd. We agree and therefore affirm.

**I. Background Facts and Proceedings.**

In 2011, The City of Iowa City wanted to develop a new industrial park. As a part of the development, the city wanted to construct a new street—Compass Drive—over the right-of-way of Iowa Interstate Railroad, Ltd. (IAIS). The construction involved the right to construct the street but also utility crossing rights and accompanying sidewalks. In short, an issue arose concerning who had the authority to grant the rights sought by the City. To answer this question, we are required to review the property rights the parties purchased from the original owner, the Chicago, Rock Island and Pacific Railroad Company.

The property rights of the Chicago, Rock Island and Pacific Railroad were ordered liquidated during bankruptcy proceedings, and its assets were abandoned, sold, disbursed, or scrapped. In 1983, a reorganized company known as Chicago Pacific Corporation (CPC) became the successor to the railroad's remaining assets, which included the "bundle of rights" CPC had in the rail line from Council Bluffs, Iowa, to Bureau, Illionois. The bundle of rights was divided into three categories: (1) the rail corridor and operating rights, (2) the utility and associated easement rights, and (3) the

---

[1] "Q. [G]rade crossings are used for people to cross over the tracks, correct? A.[by Rick Stickle] People, vehicles, animals."

mineral rights.[2]  CPC also had rights in rail lines facing abandonment and in various ancillary properties and defunct rail lines.

In 1984, Heartland Rail Corporation (Heartland) bought the rail corridor running from Council Bluffs to Bureau to prevent its abandonment and preserve rail access for its shareholders.  Heartland later transferred its interest in the rail line between Council Bluffs and Chicago—including the tracks in Iowa City—to IAIS, an interstate common carrier operating rail services.

Following the bankruptcy, CPC made the decision to divest itself of its remaining rights, and approached Rick Stickle, who previously was a salvage contractor for CPC and is the owner of Hawkeye Land Company.  On July 1, 1985, Hawkeye purchased the utility and associated easement rights from CPC.

We find additional background information in a prior supreme court case, *Hawkeye Land Co. v. Iowa Utilities Board*:

> In 2000, the Iowa Senate issued a concurrent resolution "relating to a study of the issues involving railroad rights-of-way crossings by utilities."  S. Con. Res. 119, 78th G.A. (Iowa 2000).  Senate Concurrent Resolution 119 proposed that representatives from Iowa utilities—including electricity, natural gas, telephone service, and rural water service—meet with railroad representatives to consider legislative solutions that might "resolve legal and practical problems and differences of opinion" between the parties.  *Id.*  [The Iowa Utilities Board] IUB was to facilitate the meetings.  *Id.*
>
> The problems referred to in the resolution related to the requirements utilities had to fulfill in order to secure a railroad crossing and the fees railroads charged utilities for crossings.  The utilities were dissatisfied with the complexity of the application process and the time it took to obtain permission to cross railroad tracks.  The utilities also complained that the railroads charged excessive fees for crossings.  The utilities proposed a pay-and-go system under which utilities could notify a railroad of a desired crossing, pay a one-time fee, and then move forward with construction—without awaiting individual review and approval by the railroads.  The railroads sought to ensure that utility crossings would be safe and would not create liability for the railroads.  The railroads also advocated for their right,

---

[2] The mining rights are not at issue here.

as property owners, to set their own fees for railroad crossings. Legislators had introduced and considered bills in the house and senate relating to these issues, and the resolution sought additional input from the interested parties. *Id.*

Hawkeye Land was actively involved in the resulting discussions. Hawkeye Land owns the right to grant easements along more than two thousand miles of Iowa railroad track, but does not own the railroad track itself. It purchased this property right in 1985, during bankruptcy proceedings for the Chicago, Rock Island and Pacific Railroad. The bankruptcy trustee separated ownership of the physical railroad tracks from the right to grant easements along and across the tracks. . . .

Hawkeye Land wrote a letter to IUB in August 2000 presenting its position on railroad-crossing issues. Hawkeye Land noted that easement fees were the company's revenue source and commented: "Hawkeye incurs costs in generating those easements and when one considers the lack of regard for a recorded document and the exposure that Hawkeye incurs because of this ignorance, overall the revenue does not match the risk." Hawkeye Land offered to meet with IUB and the other parties to discuss crossing issues.

Both the railroads and the utilities acknowledged Hawkeye Land as an interested party. The Iowa Utility Association pointed to Hawkeye Land as a source of the problems they identified; namely, that Hawkeye Land's crossing application process took too long and it charged exorbitant fees.[3] The railroads summarized the progress the railroads and utilities had made in negotiations. Under the topic of "Absentee Managers/Land Management Companies," the railroads commented "Hawkeye is a unique situation that the Railroads are powerless to address, but it appears that Hawkeye is at the table and will participate in resolving the issues."

847 N.W.2d 199, 202-03 (2014).

But negotiations between the utilities and Hawkeye broke down and the utilities companies turned their efforts to legislation, resulting in a pay-and-go process under Iowa Code section 476.27 (2009). *See Hawkeye Land*, 847 N.W.2d at 203. "Pursuant to section 476.27 and its related regulations, a public utility can erect a crossing over a railroad right-of-way by submitting a notification of intent to construct and paying a one-time standard crossing fee of $750 for each crossing." *Id.* Hawkeye challenged the

---

[3] At trial here, Stickle testified for Hawkeye Land that the fees charged for its rights ranged from hundreds of dollars to millions of dollars.

statute, asserting the provision did not apply to its property interest and the $750 crossing fee for utilities was an unconstitutional taking. *Id.* at 209.

Our supreme court concluded Hawkeye was a successor in interest to a railroad corporation and, thus, subject to section 476.27:

> If the right to grant easements had never been separated from ownership of the remaining fee, Union Pacific would be required to comply with section 476.27 as the railroad owning the tracks. Separating the right to grant easements from the bundle of property rights does not exempt the easement from section 476.27. We also reject the notion that the owner must obtain its property rights directly from a railroad in order to be a successor in interest to a railroad corporation. Under Hawkeye Land's interpretation of section 476.27, a railroad could avoid the pay-and-go procedure by using a straw man to transfer ownership of a crossing easement to a third party. We will not open such a loophole. Rather, we are to "'seek a reasonable interpretation which will best effectuate the purpose of the statute.'"
>
> The legislative history of section 476.27 reinforces our conclusion that the legislature intended that statute to cover Hawkeye Land. Hawkeye Land participated in the meetings and discussions leading up to the passage of section 476.27. The legislature was aware of Hawkeye Land's existence and its interest in the railroad crossings, which explains why the legislature did not simply limit the ambit of section 476.27 to railroads. The legislature knew Hawkeye Land had purchased the right to grant easements indirectly from the Chicago, Rock Island and Pacific Railroad. By defining "railroad right-of-way" broadly to include successors in interest to railroad corporations, the legislature ensured the procedures of section 476.27 could not be avoided by conveying crossing easements to separate entities.

*Id.* at 212-13 (citations omitted).

The supreme court did not reach Hawkeye's constitutional claim because it found the party seeking to invoke the pay-and-go provision—ITC Midwest, an independent transmission company—was not a public utility and could not invoke the provision.[4] *Id.* at 219.

---

[4] Section 476.27(1)(e) was subsequently amended to include "electric transmission owners primarily providing services to public utilities as defined in section 476.1." *See* 2015 Iowa Acts ch. 115, §§ 1, 2.

On February 25, 2011, the City sent a "notice of intent to construct utility crossing" to Hawkeye, which stated that in connection with the City's construction of Compass Drive, the City "intends to construct three utility crossings (storm sewer, potable water, and sanitary sewer) under the railroad right-of-way and railroad tracks, the easement rights to which Hawkeye Land Company lays claim." The City enclosed a check for $2250 ($750 for each of the three crossings). The City sent another notice and another check for $2250 to Hawkeye on May 16, 2011, because the project had not begun "within the 120 days allowed under Iowa Administrative Code [rule] 199-42.3(4)."

On September 6, 2011, IAIS and the City entered into an "agreement for railroad crossing improvement project," acknowledging that IAIS operated a railroad upon tracks going east/west in the City and the City had "initiated a project to construct a new north/south street to be named Compass Drive, and to improve an already present agricultural crossing there to urban standards with accompanying utilities," which "require[d] the installation of a new street-railroad grade crossing with crossing signals and gate arms and with associated drainage improvements on [IAIS's] railroad right-of-way."[5]

On October 12, 2011, Hawkeye filed this action against the City for damages based upon the City's installation of Compass Drive crossing the rail line. IAIS intervened in the action. The parties waived jury trial, and the bench trial was held on October 3–5, 2016.

The court summarized the parties' positions,

Hawkeye has claimed it had and has the exclusive right to grant grade crossings, and that the City's drainage and street construction at the

---

[5] If the rail carrier and City are unable to agree, each can initiate an administrative proceeding to request the department of transportation to resolve the dispute. *See* Iowa Code ch. 327G.

Compass Drive crossing illegally intrudes upon Hawkeye's property rights. Hawkeye has sought damages for trespass and unjust enrichment, and has requested that the City be ejected from the property, with damages awarded for wrongful occupation. IAIS has intervened, claiming that IAIS, not Hawkeye, owned the property rights that are the subject of this action, and seeks a declaration that IAIS has the right to grant grade crossings on the property, including the Compass Drive crossing. IAIS also seeks a permanent injunction from Hawkeye claiming such rights. IAIS has counterclaimed against Hawkeye for tortious interference with contract and tortious interference with prospective economic advantage.

On January 4, 2017, the trial court entered its findings of fact, conclusions of law, judgment, and decree. First, the court concluded:

When the plain language of the 1984 deed is considered in the context of each of the three canons of construction relied on by [IAIS's expert witness] Mr. [Robert] Downer, the court agrees with the reasoning and opinions of Mr. Downer and concludes that the canons of construction serve to bar Hawkeye's claim that it has the ability to grant grade crossing rights.

The trial court noted that "the discussion and conclusions above based on the canons of construction are dispositive of Hawkeye's claims," but it also determined that interpreting any ambiguity in the deed led to the same conclusion. The court dismissed Hawkeye's claims, finding "that IAIS possesses the sole right to grant grade crossings along its entire right-of-way, including at Compass Drive, and that Hawkeye does not hold the sole and exclusive right to grant grade crossings to third parties." Hawkeye appeals.

**II. Scope and Standard of Review.**

The parties disagree about our scope of review. Asserting that the relief sought was equitable, Hawkeye contends our review is de novo. IAIS and the City argue the action was tried as a law action and, therefore, our review is for correction of errors at law. We agree with IAIS and the City.

The ultimate question presented is who has the right to grant grade crossings under the 1984 deed. This case was filed as an action at law, a jury trial was waived, and

the court ruled on evidentiary objections. *See Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 178 (Iowa 2010)[6] We conclude the case was tried at law and, consequently, the findings of the trial court as fact finder are binding on us if supported by substantial evidence. *See* Iowa R. App. P. 6.904(3)(a).

## III. Discussion.

In this action, Hawkeye has claimed it has the exclusive right to grant grade crossings, and the City's drainage and street construction at the Compass Drive crossing illegally intrudes upon Hawkeye's property rights.

All parties agree that whatever rights they have stem from the transactions by CPC transferring its "bundle of rights" in the rail line. In October 1984, CPC (as grantor) gave Heartland (as grantee) a deed conveying:

> all of Grantor's right, title and interest in and to the railroad right-of-way property described in Exhibit A, attached hereto and made a part hereof, including and together with all improvements, tenements, fixtures, appurtenances thereto, rights-of-way, strips and gores of land, abutting extra-width land, improvements affixed or installed, such as rail and right-of-way fences, buildings, passages, sewer rights, trackage, signal and communications equipment, waters, water courses, water rights and powers, flowers, shrubs, crops, trees, timber and other emblements now or hereinafter located on the property or under or above the same or any part or parcel thereof, and all rights, titles, interests and appurtenances, whatsoever, in any way belonging, relating, or appertaining to the property or any part thereof, or which shall in any way belong, relate, or be appurtenant thereto; and it being understood that the enumeration of any specific articles of property shall in no wise exclude or be held to exclude any items of property not specifically mentioned. All of the property hereinabove described, real, personal and mixed, whether affixed or

---

[6] In *Van Sloun*, 778 N.W.2d at 178, the court explained:

> "To determine the proper standard of review, we consider the 'pleadings, relief sought, and nature of the case [to] determine whether a declaratory judgment action is legal or equitable.' " [*Passehl Estate v. Passehl*, 712 N.W.2d 408, 414 (Iowa 2006)] (quoting *Nelson v. Agro Globe Eng'g, Inc.*, 578 N.W.2d 659, 661 (Iowa 1998)). "Where there is uncertainty, a litmus test we have applied is whether evidentiary objections were ruled on by trial court." *Citizens Sav. Bank v. Sac City State Bank*, 315 N.W.2d 20, 24 (Iowa 1982); *accord Passehl*, 712 N.W.2d at 414.

annexed or not (except where otherwise hereinabove specified) and all rights hereby conveyed and transferred are intended so to be as a unit and are hereby understood, agreed and declared to form a part and parcel of the property ("Property") and to be appropriated to the use of the Property, including but not limited to property shown on maps attached hereto as Exhibit B, ond further including the property described in the sources of title shown on said maps, insofar as such property is described in said Exhibit A.

The 1984 deed includes this reservation language:

> Grantor reserves for itself, its successors and assigns, exclusive perpetual easements and the exclusive right to grant easements, leases or licenses, either in perpetuity or for terms, for the construction, installation, creation, reconstruction, reinstallation, re-erection, relocation, maintenance, removal, repair, replacement, use and operation of transportation and transmission systems for all and every type of fluids, gases, resources, materials, products, communications and energy by whatever means including, without limitation, overhead conveyors, pipelines, telephone, radio, radar or laser transmission systems, wire, cable, fiber, fiber-optic, utility, energy and power transmission lines or conduits of every kind and character together with all necessary supporting structures and devices which may be constructed, erected or installed on, in, under, over, above, across and along all or any portion of the Property at any time from time to time in the future, upon such terms as Grantor deems appropriate in its sole discretion; and
>
> Grantor reserves to itself, its successors and assigns, the exclusive right to convert or amend any existing easements, licenses, leases or agreements for conduits, sewers, water mains, gas lines, electric power lines, cables, wires or other energy, communications and utility lines of any kind whatsoever beneath, in, on, over, across, along, or above the surface of the Property to easements, leases, or licenses, either in perpetuity or for terms, for the continued maintenance, operation and use of the same or to otherwise modify any existing easements, licenses, leases, or agreements upon such terms as Grantor deems appropriate in its sole discretion . . . .

The deed also provided: "The exercise of Grantor's rights reserved herein in respect of the easement grants, leases, licenses, and agreements shall not unreasonably interfere with the use, operation and maintenance of the surface of the property by Grantee, its successors or assigns."

Our task, like the trial court's, is to determine what the contracting parties intended. *See DuTrac Cmty. Credit Union v. Radiology Grp. Real Estate, L.C.*, 891 N.W.2d 210, 216 (Iowa 2017).

> Generally, when we interpret contracts, we look to the language contained within the four corners of the document. *Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 615 (Iowa 2006). "In the construction of written contracts, the cardinal principle is that the intent of the parties must control, and except in cases of ambiguity, this is determined by what the contract itself says." Iowa R. Civ. P. 6.904(3)(*l*); *see also Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011). If the intent of the parties is clear and unambiguous from the words of the contract itself, we will enforce the contract as written. *Am. Soil Processing, Inc. v. Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.*, 586 N.W.2d 325, 329 (Iowa 1998).
> If the language of the contract is ambiguous, then we engage in interpretation in order to determine "the meanings attached by each party at the time the contract was made." *Clinton Physical Therapy Servs.*, 714 N.W.2d at 615 (quoting E. Allan Farnsworth, *Contracts* § 7.9, at 458 (3d ed. 1999)). To the extent necessary to reveal the parties' intent, extrinsic evidence is admissible. *Id.*

*DuTrac Cmty. Credit Union*, 891 N.W.2d at 216.

Hawkeye asserts the district court wrongly looked only to the plain language of the 1984 deed and the rules of construction "without considering extrinsic evidence or rules of interpretation." It further asserts that the three canons of construction applied by the district court were not applicable to the situation and were expressly prohibited by the deed.

With respect to the intent of the contracting parties, the trial court found:

> The court found to be credible and persuasive the testimony of defense experts Scott Bannister and Robert Downer on the question of whether the reservation retained to CPC the right to grant grade crossings. Mr. Bannister helped to form Heartland, and currently is an employee of Iowa Northern Railway Company. Mr. Bannister negotiated the 1984 deed and transaction, and his credible testimony at trial was that the purpose of this reservation was to identify the reservation of the right being retained by CPC to grant easements in regard to the transportation

and transmission systems for all types of fluids, gases, resources, materials, products, communication and energy, "by whatever means." According to Mr. Bannister, during the negotiations between Heartland and CPC, CPC never indicated that the purpose of the reservation was to include grade crossings or the right to grant grade crossings. It was Mr. Bannister's consistent and repeated testimony that CPC intended to transfer grade crossing rights to Heartland, and that the 1984 deed lacked any reservation with regard to the right to transfer grade crossings, including as to the inclusion of the reservation for utility easements. Mr. Bannister had personal knowledge of the terms of the 1984 deed, and his testimony regarding negotiation of the 1984 deed was uncontroverted by any other witness with such knowledge, or by any exhibit submitted at trial.

Mr. Downer, an experienced attorney called as an expert by IAIS, testified credibly that the reservation related to systems of transmission or conveyance of electronic signals, not including the traveling public, and that the reservation did not reserve to CPC the right to grant grade crossings.

Mr. Bartine agreed that the language at issue in the 1984 deed (including specifically, the words following "for") must be assigned some meaning, so that they are not rendered superfluous. Mr. Bartine also agreed that the words following "for" qualify the terms "transportation and transmission systems." However, Mr. Bartine contended that the language is ambiguous, particularly in comparison to the Peoria deed language. Mr. Bartine also agreed that the language must be read to make sense for railroad operations. Mr. Bartine acknowledged that the conveyance of the right-of-way at the time of the original conveyance would have conveyed to Heartland the rights related to then existing grade crossings, since granting such rights would have been required in order to allow the railroad to operate. Mr. Bartine also acknowledged that CPC reserved to itself all rights except those rights explicitly enumerated or specified. Mr. Bartine had no knowledge of any non-railroad ever claiming rights to grade crossings prior to the actions brought by Hawkeye seeking to assert such rights.

Mr. Stickle did not have any personal knowledge regarding negotiations or the 1984 transactions between CPC and Heartland, and he had no information at that time about what had been transferred to Heartland.

(Record citations omitted.)

We first observe, "[t]he district court, as the fact finder, determines witness credibility and the weight of the evidence as a whole, and we will not disturb the district court's findings if they are supported by substantial evidence." *Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 394 (Iowa 2010) (citations omitted). Having

reviewed the evidence and testimony of the witnesses here, we find no reason to disagree with the trial court's credibility assessments.

We also agree with the trial court that Hawkeye's reading of reservation language ignores the "for" that immediately follows "transportation and transmission systems," that is, "operation of transportation and transmission systems *for* all and every type of fluids, gases, resources, materials, products, communications and energy by whatever means including, without limitation, overhead conveyors, pipelines, telephone, radio, radar or laser transmission systems, wire, cable, fiber, fiber-optic, utility, energy and power transmission lines . . . ." Hawkeye's attempt to ignore the subsequent, qualifying language improperly alters the meaning.

The district court ruled:

Hawkeye, as the party that has argued in summary judgment pleadings that extrinsic evidence is necessary to determine whether it has the grade crossing rights it claims, bore the burden of affirmatively offering extrinsic evidence to establish that it obtained the grade crossing rights through the series of transactions at issue in this matter. Similarly, the court concludes IAIS may rely on the absence of extrinsic evidence to argue that Hawkeye has not shown that there is any language in any of the relevant documents that supports a conclusion that Hawkeye has retained the grade crossing rights.

. . . .

The court first finds that the words of the 1984 deed plainly transfer the entirety of the property at issue therein, as well as the right to grant grade crossings, to Heartland. This is clear because the 1984 deed has a broad granting clause which conveyed everything CPC owned to Heartland, except the limited reservations subsequently transferred to Hawkeye. Further, the reservations in the 1984 deed do not include a right to grant grade crossings, as evidenced by the testimony of Mr. Bannister and Mr. Downer.

The court's direct questions of Mr. Stickle at trial show the court's concern with Hawkeye's attempt to ignore the word "for," which follows "transportation and transmission systems" in the 1984 deed's reservation of rights. The court concludes such reservation simply cannot be read to reserve grade crossing rights. Therefore, the court concludes IAIS, as successor to Heartland, holds the grade crossing rights. This interpretation

of the 1984 deed alone is sufficient for the court to declare that IAIS possesses the exclusive right to grant grade crossings on its rail corridor.

Even considering the limited extrinsic evidence offered by Hawkeye and extrinsic evidence offered by IAIS at trial, the court finds no persuasive extrinsic evidence to support a conclusion that Hawkeye retained the right to grant grade crossings in the 1984 deed. Mr. [Paul] Victor offered credible testimony that Rock Island did not consider separating the rail operating rights from the right to grant grade crossings. Mr. Bannister testified credibly that it was the intent of the parties, in the CPC to Heartland transaction, to transfer the right to grant grade crossings to Heartland, and that CPC knew how to retain crossing rights when it reserved rail crossing rights, but CPC failed to do so with respect to grade crossing rights. Mr. Bannister's testimony also was persuasive as to the Assignment and Assumption Agreement.

The court concludes that, pursuant to the Assignment and Assumption Agreement, CPC transferred to Heartland all of CPC's interest and rights to a variety of agreements, including agreements for overpasses, underpasses and grade crossings to which Heartland continued receiving revenue after closing with CPC. The court also concludes such provisions establish CPC's intent to transfer the right to grant grade crossings to Heartland.

Finally, as to the Heartland to IAIS lease, Mr. Bannister provided credible testimony that the custodial clause in the lease (which gave IAIS the right and obligation to control ingress and egress to the property and over the tracks) was to ensure that IAIS understood that one of its responsibilities was to grant grade crossings. This testimony from Mr. Bannister also was supported by Mr. Victor's testimony that the lease terms are consistent with the operating carrier having the right to grant grade crossings.

(Footnote and record citations omitted.)

Stickle acknowledged that CPC could not transfer to Hawkeye what had already been transferred to Heartland. The language of the granting clause is very broad. The trial court noted that the deposition testimony of expert witness William Bartine opined the language "all improvements, tenements, fixtures, appurtenances thereto, rights-of-way" and the use of the term "passages" resulted in the transfer of the existing grade crossings to Heartland. Moreover, the granting clause provides "the enumeration of any specific

articles of property shall in no wise exclude or be held to exclude any items of property not specifically mentioned."

Stickle also acknowledged that as part of transactions between CPC and Heartland, CPC transferred to or assigned to Heartland various agreements, including grade crossing agreements.[7]  For almost thirty years, Hawkeye conducted its business of selling easement rights (and making millions of dollars doing so) and never claimed the right to grant grade crossings.  We note the following testimony by Stickle:

> Q. Now, in 1985, when you did the deal with CPC, you weren't aware at that time that you were receiving the right to grant grade crossings; isn't that correct?  A. That's correct.
> Q. And, in fact, at no time in the '80s did that even occur to you, did it?  A. No, no, it didn't.
> Q. And it may or may not have been in the '90s when you first realized that you might have received the right to grant grade crossings; is that fair?  A. That's fair, yes.
> . . . .
> Q. I understand that Hawkeye is [now] claiming that it has the right to grant grade crossings.  Can you identify even a single instance where Hawkeye granted a public grade crossing?  A. No.
> . . . .
> Q. So the first time [Hawkeye asserted the right to grant grade crossings] was 2012?  A. Yes.

Importantly, the 1984 deed provided: "The exercise of Grantor's rights reserved herein in respect of the easement grants, leases, licenses, and agreements shall not unreasonably interfere with the use, operation and maintenance of the surface of the

---

[7] In conjunction with the 1984 deed, CPC and Heartland entered into an "assignment and assumption of agreements," whereby CPC

> hereby transfers, assigns, and sets over to Heartland all of the agreements and leases and all of its rights and obligations thereunder pertaining to the use, maintenance, operation or existence of a line of railroad, including without limitation track repair agreements with the Iowa Department of Transportation, shippers and shipper associations providing for refund of advance payments, agreements for joint operation and trackage rights agreements, licenses and easements which are identified on the attached Exhibit A.

Exhibit A included a number of grade-crossing agreements.

property by Grantee, its successors or assigns." At trial, Stickle testified that while there are state and federal regulations regarding street crossing of railroad tracks and Hawkeye had the right to grant grade crossings, Hawkeye had no safety obligations—the railroad had all safety and regulatory compliance obligations. The evidence presented at trial establishes the absurdity of such an interpretation:

> Mr. Bannister . . . testified that any third party having the right to grant or oversee anything to do with regard to railroad grade crossings could be disastrous for the safe operations of the railroad. Former Rock Island executive and IAIS's first Chief Operating Office Paul Victor also testified that a third party's right to grant grade crossings could create operational and safety challenges, and would impact a railroad's entire operations.
>
> Joe Parsons, the current Chief Operation Officer of IAIS, testified that grade crossings impact numerous railroad operations, including the speed at which trains can be operated; the obligations of train crews at crossings; where railroad equipment can be stored; the planned meetings and passing of trains; train length and frequency; liability from grade crossings; braking of trains; coordination with other railroads; shipping business of railroads; and requirements and record-keeping procedures for complaints regarding signal systems. Mr. Parsons also testified that utility crossings have no operational impacts on IAIS.
>
> Chad Lambi, IAIS's Assistant Chief Engineer, testified that a third party's right to grant grade crossings would unreasonably interfere with railroad operation and maintenance. More specifically, Mr. Lambi testified railroad operations require specialized equipment; crossings are bound by federal regulations that require specific warning devices, site distance clearances, train horn compliance, and appropriate approach circuitry; the railroad is required to work closely with the road authority to develop plans for a grade crossing; grade crossings require more ongoing maintenance than regular sections of track; grade crossings require significant inspections to comply with signal requirements; the railroad track deteriorates more quickly at grade crossings than at other locations; grade crossings interfere with on-track repair equipment; crossing warning devices must be disabled when a railroad is working on sections of track within the vicinity of a grade crossing; drainage at grade crossings is more of an issue and has implications for a railroad's ability to comply with federal regulations regarding track classification standards; and a railroad can be fined by state and federal rail inspectors if the ballast at grade crossings becomes muddy due to poor drainage.

Hawkeye's attempt to rely on the reference to "transportation systems" as meaning streets for motor vehicles is also misplaced. In support of its argument, Hawkeye relies upon extrinsic evidence of other deeds and documents. However, Hawkeye's purchase agreement references transportation systems under the heading "Energy Easements," which clearly implies "transportation system" refers to transporting energy such as electricity, fluids, or gases rather than streets or roadways. We acknowledge that generally when a deed is accepted in compliance with the terms of a real estate contract, the contract is merged in the deed. *Dickerson v. Morse*, 212 N.W. 933, 934 (Iowa 1927). However, that presumption of merger is subject to "many qualifications, one of which is that collateral agreements or conditions not incorporated in the deed or inconsistent therewith will be deemed to survive for the purpose of enforcement." *Phelan v. Peeters*, 152 N.W.2d 601, 602 (Iowa 1967) (concluding contract requirement that seller pay paving assessment did not merge into deed). Here, the deed to Hawkeye states, "This conveyance is made pursuant to the terms of a Purchase Agreement dated April 29, 1985, and the terms thereof *shall survive delivery of this Quitclaim Deed*." (Emphasis added.) Because the terms of the purchase agreement survive, we conclude the reference to "transportation systems" under the heading of "Energy Easements" in the purchase contract lends further support to the district court's interpretation.

The result reached is also not a departure from railroad easement or right-of-way rights.[8] The United States Supreme Court has observed, "A railroad right of way is a very substantial thing. It is more than a mere right of passage. It is more than an easement."

---

[8] Heartland's deed from CPC states the grantor's intent was "to quitclaim all of its right, title, and interest to its railroad right-of-way and contiguous property" with certain exceptions and reservations.

*W. Union Tel. Co. v. Pa. R.R. Co.*, 195 U.S. 540, 570 (1904). Courts "have consistently recognized that the easement is bigger, more extensive, and exclusive as against the fee owner than most private easments and public utility easments." Danaya C. Wright & Jeffrey M. Hester, *Pipes, Wires, and Bicycles: Rails-to-Trails, Utility Licenses, and the Shifitng Scope of Railroad Easements from the Nineteenth to the Twenty-first Centuries*, 27 Ecology L. Q. 351, 387-88 (2000). Because railroads are held to the highest accountability in their performance and are regulated by federal and state authorities, the railroad must have the exclusive possession and control of the land. *Id.* at 397-99. Thus, decisions of federal and most state courts are to the effect that the owner of the servient estate has no right to occupy or convey the land without the railroad's consent. *Id.* at 400. Here, Hawkeye may be entitled to the payment for the utility easement or other license or right granted, but Heartland is entitled to determine who or how another may use its corridor just as the real estate transactions intended.

The trial court issued a detailed and extensive ruling addressing all issues raised by Hawkeye. We find no errors of law, and the findings of the trial court are supported by substantial evidence. We therefore affirm.

**AFFIRMED.**