# In the Iowa Supreme Court

No. 24–1139

Submitted March 25, 2026—Filed May 1, 2026

In the matter of the **Estate of James Edwin Ibeling.**

**Nancy Ibeling,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Katie Ranes, district associate probate judge.

A surviving spouse seeks further review from a court of appeals decision holding that assets transferred to a Panamanian private interest foundation founded by her husband are not included in the elective share under Iowa Code section 633.238(1)(*d*)(1). **Decision of Court of Appeals and District Court Judgment Affirmed.**

McDonald, J., delivered the opinion of the court, in which Oxley, McDermott, and May, JJ., joined. Mansfield, J., filed a dissenting opinion, in which Christensen, C.J., and Waterman, J., joined.

Gary Dickey (argued) of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, and Dallas J. Janssen of Janssen Law, PLC, Des Moines, for appellant.

Matthew G. Sease (argued) of Sease & Wadding, Des Moines, for appellee.

**McDonald, Justice.**

The surviving spouse of a decedent may elect to claim a share of statutorily "limited" property of the decedent against the decedent's will, including one third of the value of the decedent's property held in a revocable trust. Iowa Code section 633.238(1)(*d*)(1) (2021). The question presented in this appeal is whether the statutory provision creating the right to take an elective share of such property is applicable to property held by a distinct legal entity that is not a revocable trust but shares some of the same characteristics as a revocable trust.

I.

In December 2013, James Ibeling contacted a lawyer in Panama, Carlos Eduardo Varela Cardenal, in connection with a real estate development project. James asked Cardenal to establish a private interest foundation (PIF) pursuant to Panama's Law No. 25 of June 12, 1995. The foundation was named the Harris 6 Foundation. Harris 6 was registered with the Republic of Panama in January 2014. James was both the founder of Harris 6 and the main beneficiary during his lifetime.

In the event of James's death, the PIF regulations directed that the foundation assets be passed to the substitute beneficiaries in equal parts. The regulations listed four substitute beneficiaries: a testamentary charitable foundation named the James Ibeling Foundation; James's longtime personal assistant and bookkeeper, Lisa Mengwasser; James's nephew; and a minor from Arizona whom James considered a friend and who is also named as a beneficiary in James's will, Deyon Rashad Harris. According to the foundation charter, the purpose of the PIF was to "cover the costs of education, training, equipment, aid, as well as the general maintenance or other similar purposes of one or more members of one or more families specified" and to "benefit other natural or legal

persons or institutions of any nature and take the necessary provisions for the orderly succession of their assets."

James did not transfer any assets into the PIF at the time of its creation, and it remained unfunded for the next five years. In August 2019, James reconnected with Cardenal because he wanted to transfer assets to the PIF. James's assistant communicated to Cardenal that "[t]he purpose of transferring assets into the Foundation [was] because Jim [was] considering getting married (without a prenup) and want[ed] to protect his assets." James conveyed twelve properties in Arizona to the PIF by warranty deeds. Under Panamanian law, Harris 6 was the owner of the properties. The warranty deeds were recorded on August 23. Three days later, on August 26, James married Nancy.

James died on February 17, 2021. He was seventy-five years old. At the time of James's death, Harris 6 owned ten Arizona properties. Mengwasser was the executor of James's estate, and she testified that some of the properties were in the process of being sold to satisfy James's debts. She estimated that three properties would remain in Harris 6 by the time the debts were settled and that the value of those three properties would be at or above $1.1 million.

Nancy filed for an elective share of James's estate against James's will pursuant to Iowa Code section 633.238. As relevant here, that statute provides:

> One-third in value of the property held in trust not necessary for the payment of debts and charges over which the decedent was a settlor and retained at the time of death the power to alter, amend, or revoke the trust, or over which the decedent waived or rescinded any such power within one year of the date of death, and to which the surviving spouse has not made any express written relinquishment . . . .

Iowa Code § 633.238(1)(d)(1).

The guardian ad litem for the minor beneficiary, Harris, filed an application for a declaratory judgment seeking a declaration that the PIF assets

were not included in Nancy's spousal share. At the hearing on the declaratory judgment action, the guardian ad litem called an expert on Panamanian PIFs, Juan Pablo Fábrega Polleri. Fábrega Polleri testified that PIFs are not trusts. Fábrega Polleri testified that a PIF "is a legal entity with existence of its own and with capacity to be subject of rights and to enter into obligations as an individual or as a corporation that gained . . . its legal existence by virtue of the registration of its foundation charter in the public registry of Panama." He next explained the process to create a PIF:

> An individual signs, executes a charter. That document is notarized following Panama's regulation. It's notarized into public deed before a notary public in Panama. You take that public deed to the public registry, and the public registry registers that document.
>
> . . . .
>
> . . . [T]he foundation then once registered it has its own legal capacity to exercise rights and to acquire obligations under the same circumstances that a natural or physical person would as well as a type of -- any other type of legal entity.
>
> Even though the founder is the creator of the foundation, it is the foundation council as an administrative organ of the legal entity who manages and disposes of the assets of the foundation, as per the provisions set out by the founder in the foundation charter or its bylaws which regulate, you know, further regulate the foundation charter.

Fábrega Polleri acknowledged that there are similarities between trusts and PIFs, for example, "both are vehicles used primarily for family and estate planning." He explained that "[w]ith a trust and a [PIF], the settlor and the founder respectively can arrange, in any orderly manner and without having to go through an inheritance process, a transfer of his/her estate to his or her heirs." He explained that despite the similarities, PIFs are distinct from trusts, which also exist in Panama and are governed by a different set of laws.

Cardenal, James's Panamanian attorney, also testified at the hearing. He testified that he created Harris 6 for James and that he understood that James wanted to create the PIF to shield his assets from a potential spousal claim. He testified that James conveyed the Arizona properties to the PIF and that they were to be held in the PIF for James's benefit during James's lifetime.

The probate court granted the application for declaratory judgment. The court identified several features of a PIF that make it distinguishable from a revocable trust. First, the court recognized that, under Panamanian law, a PIF is a distinct legal entity, much like a corporation. Assets in a PIF are owned by the PIF, not the founder, "protector," or "council" of the foundation. Similarly, the court noted that James's personal debts cannot be satisfied by the PIF assets under Panamanian law. They are completely separate. Again, more like a corporation than a trust, a PIF is required to obtain its own tax identification status in Panama. The court relied heavily on the statutory language of Iowa Code section 633.238, emphasizing that the elective share is "limited to" the categories of property specifically enumerated in the statute. The court further rejected Nancy's argument that defects in the administration of the PIF, including the existence of mortgages, warranted disregarding the foundation altogether.

Nancy timely appealed, and we transferred the case to the court of appeals. The court of appeals, relying on *In re Estate of Myers*, 825 N.W.2d 1, 3 (Iowa 2012), affirmed that a PIF is not a revocable trust and, thus, is not in the listed assets under section 633.238(1) that are subject to Nancy's elective share. Nancy sought further review from our court, which we granted.

II.

Probate actions are tried in equity and are usually reviewed de novo. *See Myers*, 825 N.W.2d at 3. However, "when there are no disputed facts and the appeal turns on whether the probate court's interpretation of a statute was erroneous, . . . our review is for correction of errors of law." *Id.* at 3–4. This case presents a question of law, one of statutory interpretation.

As with all questions of statutory interpretation, we begin with the text of the statute at issue. *See State v. Brown*, 16 N.W.3d 288, 296 (Iowa 2025). Iowa Code section 633.238 creates a limited statutory right for a surviving spouse to elect to take a share of certain property against a decedent spouse's will. That section provides:

> 1. The elective share of the surviving spouse shall be limited to all of the following:
>
> *a.* One-third in value of all the legal or equitable estates in real property possessed by the decedent at any time during the marriage which have not been sold on execution or other judicial sale, and to which the surviving spouse has made no express written relinquishment of right, including but not limited to any relinquishments of rights described in paragraph "d".
>
> *b.* All personal property that, at the time of death, was in the hands of the decedent as the head of a family, exempt from execution.
>
> *c.* One-third of all personal property of the decedent that is not necessary for the payment of debts and charges.
>
> *d.* (1) One-third in value of the property held in trust not necessary for the payment of debts and charges over which the decedent was a settlor and retained at the time of death the power to alter, amend, or revoke the trust, or over which the decedent waived or rescinded any such power within one year of the date of death, and to which the surviving spouse has not made any express written relinquishment in compliance with subparagraph (2).

Iowa Code § 633.238(1).

The parties dispute whether subsection (*d*) applies only to property held in a revocable trust or whether it should be read more broadly to include property owned by an entity that shares some legal characteristics of a revocable trust but is not a revocable trust. We conclude the better interpretation and construction of the statute is that section 633.238(1)(*d*) includes only property held in a revocable trust (or in a trust converted from a revocable to an irrevocable trust within a year of the decedent's death) governed by trust law and not property held by a separate legal entity governed by a different body of law. We reach that conclusion based on the ordinary meaning of the legal terms used in the statute when the statute is read as a whole and read in light of the relevant law. *See Cnty. Bank v. Shalla*, 20 N.W.3d 812, 818 (Iowa 2025) (stating the court must determine the ordinary meaning of the statute when the statute is read "as a whole and in context" rather than "just isolated words and phrases" (quoting *Doe v. State*, 943 N.W.2d 608, 610 (Iowa 2020))).

The text of the statute creates but strictly limits the statutory right. The statute provides that the elective share "*shall be limited* to all of the following." Iowa Code § 633.238(1) (emphasis added). The statute then lists four specific categories of property. *See id.* "It is clear that the legislature, by this language, intended to limit the property that would be included in the surviving spouse's elective share to the four categories of property specifically identified in the statute." *Myers*, 825 N.W.2d at 6; *id.* at 8 ("[O]nly the assets specifically enumerated in section 633.238 may be included in the surviving spouse's elective share."). Thus, the list is exclusive, not inclusive; exhaustive, not illustrative. *See Hawkeye Land Co. v. Iowa Utilities Bd.*, 847 N.W.2d 199, 215 (Iowa 2014) (explaining that the legislature knows how to create an open list if it wants to do so). It is not the province of this court to expand the legislature's

limited list of property subject to the elective share under the guise of interpretation and construction. *See Sallee v. Stewart*, 827 N.W.2d 128, 150 (Iowa 2013) (stating that, absent expansive language, "[t]he legislature clearly has not empowered this court to expand or update the [statutory] list").

Property owned by a PIF is not one of the four categories of property identified in the statute. An argument could be made that the status of the entity that owns or holds the property is not relevant because the first part of the statute states it applies to property "held in trust." Iowa Code § 633.238(1)(*d*)(1). That argument ignores, however, the second portion of the statute, which discusses property "held in *a* trust" and when the decedent created "*the* trust." *Id.* § 633.238(1)(*d*)(2) (emphasis added). The statute discusses transfers of real property into a "revocable trust" by a "settlor," and it refers to a "trustee of the revocable trust." *Id.* § 633.238(2). The statute's repeated use of the terms "settlor," "trustee," "revocable trust," "the trust," and "in a trust" demonstrates that the elective share applies to property held "in a trust" and not property owned or held by a legal entity similar to a trust. *See Myers*, 825 N.W.2d at 6.

The Panamanian PIF is not a trust. Section 633.238(1)(*d*)(1) uses the term "trust" without further definition. Iowa's Trust Code, chapter 633A, supplies the governing definition. It defines a "trust" as "an express trust, charitable or noncharitable, . . . wherever and however created." Iowa Code § 633A.1102(21). An express trust is one "created by the manifest intention of the settlor to create them." 76 Am. Jur. 2d *Trusts* § 17, at 49 (2016). As the "wherever and however" language indicates, a settlor can express an intent to create a trust in a variety of ways, but that language only broadens the methods by which a trust may be formed; it does not give the courts the right to reclassify a nontrust entity as a trust. *See, e.g., In re NFO Members' Custodial Acct.*, 255 N.W.2d 162, 163

(Iowa 1977) (en banc) (holding that a custodial account was a trust where "NFO authorized establishment of a trust to be known as the NFO Grain Custodial Account" and "the trust was reduced to a formal written declaration of trust"). In this case, there is no evidence that James intended to create a trust governed by the law of trusts. Instead, James chose a different legal regime to govern the arrangement. He consulted with Panamanian counsel specifically to understand how a PIF operates, and he took the steps required by Panamanian PIF law to create and fund the entity. That deliberate selection of an alternative legal framework is not a mere labeling choice to be disregarded but rather a substantive decision about the legal regime that would govern the rights and obligations of the parties with respect to the property at issue.

Nancy responds that James's intent is immaterial because the transfer of property into the PIF under these facts created a trust relationship, specifically a revocable trust, regardless of what label is applied to the entity. At first glance, Nancy's argument is colorable, but upon further inspection it reveals the primary defect in her theory of the case. The law of trusts creates a legal regime of rights, duties, obligations, standards, and remedies with respect to property in which legal and equitable title are held separately. The law of trusts governs the rights and duties of parties when they specifically create a trust subject to the law of trusts or when they enter into a transaction where the law imposes rights and duties with respect to the property at issue, and no other law governs the transaction. But where, as here, an independent body of law establishes a nontrust entity; controls the creation, governance and operation of the nontrust entity; and establishes the rights and duties of the parties with respect to the nontrust entity and the property at issue, then the independent body of law governs the legal arrangements rather than the law of trusts.

This is not simply a dispute about nomenclature. The Harris 6 Foundation is governed by precisely the kind of independent legal regime that forecloses the trust-law overlay. A PIF is a distinct legal entity governed by its own body of law prescribing its creation, its governance structure, and its operation, including the management and distribution of property owned by the PIF. Unlike a trust, a PIF is a juridical person. Unlike revocable trusts, PIFs must be registered publicly. *See* Panama Law No. 25 of June 12, 1995, art. 9. The filing of the memorandum of foundation in the Public Registry shall give the foundation juridical personality. *See id.* Property placed in a PIF cannot be used to satisfy the personal liabilities of the founder or of the beneficiaries. *See id.* art. 11. Yet, "trust property of a revocable trust is subject to the debts of the settlor to the extent of the settlor's power of revocation" during his lifetime, Iowa Code § 633A.3104(1), as well as to "[t]he charges of the settlor's estate" and "[t]he debts of the settlor," with some exceptions, *id.* § 633A.3104(2). Section 633.238(1)(*d*)(1)'s description of the revocable trust to which a spouse's elective share applies carries this same limitation—that the revocable trust first be made available "for the payment of debts and charges" of the decedent. This is yet another distinction between a PIF and a revocable trust. Finally, the existence of legal provisions respecting testamentary matters in the domicile of the founder or of the beneficiaries shall not be assessable against the foundation, affect its validity or impede the fulfillment of its objectives set forth in its memorandum of foundation or its regulations. *See* Panama Law No. 25 of June 12, 1995, art. 14.

This last provision is particularly significant. The very law that creates and defines the PIF expressly provides that the inheritance laws of the founder's domicile shall not be enforced against the foundation. A revocable trust under

Iowa law is, by express statutory design, subject to the surviving spouse's elective share. Iowa Code § 633.238(1)(*d*)(1). A PIF is, by the express terms of its enabling legislation, immune from such claims. This structural incompatibility further confirms that a PIF and a revocable trust are different legal creatures, not merely different labels for the same legal relationship. Testimony from a leading expert confirmed that a PIF is a wholly distinct estate-planning instrument designed to operate outside traditional trust law. *See also Mirabella Found. v. St. Claire Livestock Invs., Inc.,* No. 09-22112-CIV, 2009 WL 5197842, at *4 (S.D. Fla. Dec. 23, 2009) ("Panama Law 25, which governs the creation and governance of foundations, has no analog in our jurisprudence."); Carl Pacini & Nate Wadlinger, *How Shell Entities and Lack of Ownership Transparency Facilitate Tax Evasion and Modern Policy Responses to These Problems*, 102 Marq. L. Rev. 111, 127 (2018) ("The PIF is a vehicle . . . for tax management, estate planning purposes, asset protection, and as an alternative to trusts.").

Nancy relies on three cases to support her position that this separate legal entity can nonetheless be classified and treated as a revocable trust within the meaning of the elective share statute. The first is *In re NFO Members' Custodial Account v. Beneficiaries of Aforesaid Trust,* 255 N.W.2d at 163. That case involved a "formal written declaration of trust" establishing "a trust to be known as the NFO Grain Custodial Account." *Id.* "The trust operated for some time, selling members' grain, receiving proceeds, making deductions as authorized, and remitting net proceeds as directed by the trust declaration. Because of unprecedented market conditions, the trust was unable to continue." *Id.* The trustees terminated the trust and resolved to liquidate the assets. *Id.* The beneficiaries then objected to the jurisdiction of the probate court, contending that the trust was not a trust subject to the court's jurisdiction. *Id.* at 164. This

court rejected the argument, concluding that the facts showed the creation of an express trust. *Id.* So, *NFO* held that an express trust, operated for a lengthy period of time as a trust, was, in fact, an express trust. *See id.* at 164–65. The holding of the case is of little value here.

Nancy invokes *NFO* primarily for its statement that a trust "exists when legal and equitable title are separated with the person holding legal title obligated to hold and administer the property for the benefit of the one holding equitable title." *Id.* She contends that this definition describes the Harris 6 Foundation. But *NFO*'s definition serves to *identify* a trust relationship where one exists; it does not *impose* a trust classification on every arrangement in which one party holds property subject to obligations benefiting another. As explained above, where a separate body of law already governs the arrangement and defines the rights and duties of the parties, trust law has no role to play. We do not see how *NFO* advances Nancy's argument that an entity expressly not a trust and governed by a different body of law should nonetheless be reclassified as a trust, contrary to the law of the jurisdiction in which it was created.

The second case cited by Nancy is *Drewes v. Schonteich*, 31 F.3d 674 (8th Cir. 1994). The issue in *Drewes* was whether a debtor's right to receive monthly payments under charitable gift annuity agreements constituted an interest in a spendthrift trust that was excluded from her bankruptcy estate. *Id.* at 676. The transaction at issue was a contract to provide annuity payments to a third-party. *Id.* at 677. The contract itself did not create an entity and did not define the nature of the relationship the contract created among the parties. *See id.* The court thus looked to see whether the contractual relationship established all the elements of a trust, and it concluded that it did. *See id. Drewes* teaches us that where a transaction creates fiduciary relationships between persons with respect

to property that is not otherwise defined by some other body of law, the courts will look to whether the elements of a trust are present and, if they are, will classify the relationship accordingly. As with *NFO*, however, *Drewes* does not address the question presented here: whether the courts will reclassify a nontrust entity, a separate juridical person under the law creating the entity, as a revocable trust.

*In re Trust Created by Hormel*, 163 N.W.2d 844 (Minn. 1968), is even further afield. It was undisputed that a trust existed in that case. *See id.* at 846. The question was whether a charitable corporation could serve as the trustee of private trusts, and the Minnesota Supreme Court held that it could under the circumstances presented. *Id.* at 852–53. The issue in this case is the scope of Iowa Code section 633.238(1)(*d*)(1), not whether Harris 6 could have acted as a trustee of an already existing trust.

The fact that the Arizona properties were subject to a mortgage does not change the result in this case. On this record, it appears that Panamanian law insulates PIF assets from the founder's debts. The probate court acknowledged that "Mr. Ibeling's execution and administration of the Harris 6 Foundation was not perfect." This proceeding is not the proper place to collaterally litigate the validity of the PIF or whether the transfer to the PIF was valid under Panamanian law. If Nancy believes that the PIF was imperfectly created or that the transfer was defective, that issue should be litigated in Panama. Whether James's transfer complied with Panamanian law governing creditor protection has no bearing on whether the property owned by the PIF is part of the elective share under our statute.

Finally, Nancy argues that our holding today will encourage property-owning spouses to transfer assets to PIFs to evade the elective share

statute and therefore disadvantage surviving spouses. We note that these public-policy arguments are misdirected. *See Myers*, 825 N.W.2d at 7–8. "[I]t is not the role of [the] court to alter a statutory requirement in order to effect policy considerations that are vested in the legislature." *In re Marriage of Thatcher*, 864 N.W.2d 533, 546 (Iowa 2015) (second alteration in original) (quoting *Kakinami v. Kakinami*, 260 P.3d 1126, 1133 (Haw. 2011)). In any event, her argument is overstated. Panamanian Law No. 25 has been the law since 1995. In the three decades since its enactment, this is the first time our court has been presented with the issue of assets being held in a PIF. In fact, we found no published case in the past thirty years addressing property held in a PIF.

### III.

For the reasons explained above, we hold that Nancy's elective share under Iowa Code section 633.238(1)(*d*)(1) does not include one third of the value of the property owned by the Harris 6 Foundation.

**Decision of Court of Appeals and District Court Judgment Affirmed.**

Oxley, McDermott, and May, JJ., join this opinion. Mansfield, J., files a dissenting opinion, in which Christensen, C.J., and Waterman, J., join.

**Mansfield, Justice (dissenting).**

> The property by what it is should go,
> Not by the title.

William Shakespeare, *All's Well That Ends Well* act 2, sc. 3, ll. 141–42.

"If it looks like a duck, swims like a duck, and quacks like a duck, then it probably is a duck." Anonymous.

Whether we apply Shakespeare's eloquence or today's common sense, the result should be the same. The Harris 6 Foundation (Foundation) meets the criteria of Iowa Code section 633.238(1) (2021) and its assets should have been included in Nancy Ibeling's elective share.

Iowa Code section 633.238(1)(*d*)(1) provides,

> 1. The elective share of the surviving spouse shall be limited to all of the following:
>
> . . . .
>
> *d.* (1) One-third in value of the property held in trust not necessary for the payment of debts and charges over which the decedent was a settlor and retained at the time of death the power to alter, amend, or revoke the trust . . . .

The Foundation held property that James Ibeling had transferred to it in trust and over which he retained the power to alter, amend, or revoke the trust. The fact that it wasn't *called* a trust under Panamanian law should make no difference in the case. But it makes all the difference to the majority.

Let's review the facts of this case, something the majority opinion fails to do in full. James formed the Foundation in 2013, but at that time it was just an empty shell.[1] In 2019, James was "considering getting married (without a

---

[1]The documents recite that the initial funding of the Foundation was $10,000, but James's Panamanian lawyer, Carlos Varela Cardenal, testified that this was a "nominee amount," and no money was actually there.

prenup) and want[ed] to protect his assets." So he transferred a number of Arizona properties into the Foundation.

James was the only beneficiary of the Foundation during his lifetime. On his death, four beneficiaries would receive its assets. Nancy wasn't one of those beneficiaries.

James also was the "protector" of the Foundation. As protector, he had control over the Foundation. Three Panamanian individuals with the same address as James's Panamanian attorney served as the "council" for the Foundation, but they took orders from James and could be removed and replaced by him. As Juan Pablo Fábrega Polleri explained, a protector "has control over the actions of the members of the foundation council."

In short, James set up the Foundation, delivered his personal assets to it, and retained the ability during his lifetime to remove any of those assets and close down the Foundation.

The Foundation obviously wasn't called a revocable trust, but if it had been formed in Iowa, it would have been. Fábrega Polleri explained that so-called "trusts" under Panamanian law cannot have the same settlor, trustee, and beneficiary: "Panama law-wise . . . that could not happen." Fábrega Polleri added that the Panamanian private interest foundation gives the founder control over the assets he wouldn't otherwise have with a Panamanian trust, and so foreigners prefer to use the private interest foundation.

The majority argues that the Foundation does not fall within section 633.238(1)(*d*)(1) because James resorted to "an independent body of law" to create "a distinct legal entity." This argument begs the question of what the distinct legal entity looked like. Here, the distinct legal entity that James created had all the attributes of a revocable trust. It was "property held in trust . . . over

which the decedent was a settlor and retained at the time of death the power to alter, amend, or revoke the trust." Iowa Code § 633.238(1)(*d*)(1).

It doesn't matter whether James went to Panama City or Polk City to create the Foundation. It had all the features of an Iowa revocable trust. In the end, despite the majority's repeated protestations, this case is "simply a dispute about nomenclature."

The majority makes only one substantive effort to distinguish the Foundation from an Iowa revocable trust. It notes that Panamanian law does not allow the assets of a private interest foundation to be used to satisfy the demands of the founder-beneficiary's creditors. But section 633.238(1)(*d*)(1) doesn't require that. Again, the property merely has to be "held in trust . . . over which the decedent was a settlor and retained at the time of death the power to alter, amend, or revoke the trust." *Id.* Suppose Missouri passed a law that revocable trusts could not be used to satisfy the demands of the founder-beneficiary's creditors. Would that mean that an Iowan who died after transferring their Iowa assets to a Missouri revocable trust could avoid all creditors? I think not. At a minimum, a choice-of-law question would arise. *See Hussemann ex rel. Ritter v. Hussemann*, 847 N.W.2d 219, 222 (Iowa 2014) (applying choice-of-law principles to an elective-share question).

In that regard, Fábrega Polleri himself acknowledges,

> Since [the] Panamanian statute is of a domestic and territorial nature and application, the foreign judge dealing with the process could disregard the Law and seize the assets of the Foundation which are located under his/her constituency in the event a family or hereditary controversy or claim arises within a jurisdiction where the Founder or Beneficiaries have their domicile or where an asset of the Foundation's Patrimony is located.

In addition, the Foundation has all the essential features of a trust as delineated in *In re NFO Members' Custodial Account*, 255 N.W.2d 162, 164–65

(Iowa 1977) (en banc); *see also Reeder v. Reeder*, 168 N.W. 122, 124 (Iowa 1918) (stating that "[n]o technical language is necessary" to create a trust). *NFO* may be distinguishable factually, but its legal analysis is spot on.

Finally, I agree with the majority about one thing. I am skeptical of Nancy's claim that this case will lead to a flood of Iowans hiring Panamanian attorneys to set up Panamanian private interest foundations. Iowa will survive the effects of today's decision. Nevertheless, we should not be indulging a "lawyer's game." *Massachusetts v. EPA*, 549 U.S. 497, 548 (2007) (Roberts, C.J., dissenting). I dissent and would reverse the decision of the court of appeals and the judgment of the probate court.

Christensen, C.J., and Waterman, J., join this dissent.